937 F.2d 767
 60 USLW 2071, 21 Fed.R.Serv.3d 869,
33 Fed. R. Evid. Serv. 558
 Laurence KRAMER, Plaintiff-Appellant,
v.
TIME WARNER INC., Warner Communications Inc., Steven J.
Ross, Martin D. Payson, Deane F. Johnson, Bert W.
Wasserman, and Merv Adelson, Defendants-Appellees.
 No. 1198, Docket 90-9014.
 United States Court of Appeals,
Second Circuit.
 Argued April 1, 1991.
Final Submission April 26, 1991.
Decided June 27, 1991.
 
 Sidney B. Silverman, New York City (Joan T. Harnes, Harold B. Obstfeld, Silverman, Harnes & Obstfeld, of counsel), for plaintiff-appellant.
 Max Gitter, New York City (J. Jay Lobell, Paul, Weiss, Rifkind, Wharton & Garrison, Robert D. Joffe, Cravath, Swaine & Moore, of counsel), for defendants-appellees.
 Before KEARSE, WINTER and WALKER, Circuit Judges.
 WINTER, Circuit Judge:
 
 
 1
 This securities action arises from the merger of Time Incorporated ("Time") and Warner Communications, Inc. ("Warner"). Judge Sand dismissed the complaint under Fed.R.Civ.P. 12(b)(6) and 9(b). We affirm. We hold that a district court may consider relevant documents required by the securities laws to be filed with the Securities and Exchange Commission ("SEC") in determining a motion to dismiss a complaint alleging material misrepresentations and omissions in such documents. We also hold that the complaint's allegations of fraud are legally insufficient, as are the allegations concerning a violation of the Williams Act.
 
 BACKGROUND
 
 2
 On March 3, 1989, after extended negotiations, Time and Warner entered into a merger agreement ("Original Merger Agreement") calling for Time to exchange .465 of a share of its common stock for each outstanding share of Warner common stock.[1] The combined entity was to be known as Time Warner Inc. ("Time Warner"). Pursuant to this agreement, on May 24, 1989, the companies together issued a proxy statement and prospectus ("Joint Proxy Statement"), filed with the SEC, describing the proposed merger to their shareholders in anticipation of shareholders' meetings to be held on June 23, 1989. Included in the Joint Proxy Statement was detailed information concerning an arrangement that, in connection with the merger, would allow Warner's top management to resell Warner shares to Warner at a price that far exceeded the price at which they were purchased. These arrangements are described in more detail, infra.
 
 
 3
 Before the shareholder meetings, however, on June 7, 1989, Paramount Communications, Inc. ("Paramount") made an all-cash, all-shares tender offer for Time. In response to the Paramount bid, Time and Warner amended their merger agreement ("Amended Merger Agreement") to provide for a two-step acquisition of Warner by Time. In the first step, Time would make a cash tender offer for approximately 51 percent of Warner's outstanding common stock, at a price of $70.00 per share. Once that offer was successful, Time would in the second step effectuate a merger whereby holders of the remaining outstanding shares of Warner common stock would receive consideration ("Merger Consideration") defined by the Amended Merger Agreement as
 
 
 4
 cash or debt or equity securities of Time ... having a value ... equal, as nearly as practicable, in the opinion of two investment banking firms of national reputation ... to [$70 per share].
 
 
 5
 On June 19, Time announced the new tender offer and mailed to Warner shareholders a formal offer to purchase contained in a Schedule 14D-1 (collectively "Offer to Purchase") filed with the SEC. Simultaneously, Warner sent its shareholders a letter recommending acceptance of the Time offer accompanied by a Schedule 14D-9 recommendation statement that was filed with the SEC. When the tender offer closed on July 24, 1989, it was oversubscribed, and Time accepted on a pro rata basis 100 million shares of Warner common stock at $70 per share.
 
 
 6
 On August 23, 1989, Time and Warner agreed that the Merger Consideration would consist of a package of three securities. Each outstanding share of Warner common stock would be converted into a right to one share of 8.75 percent Convertible Exchangeable Preferred Stock in Time Warner, one share of 11 percent Convertible Exchangeable Preferred Stock in Time Warner, and .13827 of a share of Class A Common Stock in BHC Communications, Inc., a corporation in which Warner held a 42.5 percent interest ("Securities Package"). Three investment banks rendered opinions that the Securities Package, if issued and outstanding on August 23, 1989, would have an aggregate value (on a fully distributed basis) equal, as nearly as practicable, to $70.00. However, when the Securities Package actually began trading on December 12, 1989, its market price was approximately $61.75.
 
 
 7
 Plaintiff-appellant Laurence Kramer, a former shareholder of Warner, commenced this action in the Southern District on December 13, 1989. He sought to represent a class of former Warner shareholders who had tendered their shares pursuant to Time's June 19, 1989 tender offer. Named as defendants were Time Warner, Warner, and five former directors and senior executive officers of Warner--Steven J. Ross, Chairman and Chief Executive Officer, Merv Adelson, Vice-Chairman, Martin D. Payson, Office of the President and General Counsel, Deane F. Johnson, Office of the President, and Bert W. Wasserman, Office of the President and Chief Financial Officer. The complaint alleged federal claims of fraudulent nondisclosure in violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), as amended, 15 U.S.C. Sec. 78j(b) (1988), and SEC Rule 10b-5, 17 C.F.R. Sec. 240.10b-5 (1990), and Section 14(e) of the Williams Act, as amended, 15 U.S.C. Sec. 78n(e) (1988). It also alleged tender offer violations under Section 14(d)(7) of the Williams Act, as amended, 15 U.S.C. Sec. 78n(d)(7) (1988) and SEC Rules 14d-10 and 10b-13, 17 C.F.R. Secs. 240.14d-10 and 240.10b-13 (1990).
 
 
 8
 Most of Kramer's claims concerned compensation arrangements by which Warner's top management, including the individual defendants, received substantial financial benefits just prior to the formal consummation of the second-step merger. In 1982, Warner's shareholders approved an Equity Unit Purchase Plan ("Equity Plan") under which high-level Warner executives could purchase blocks of equity interest in the company, each block consisting of seventy-five shares of Warner common stock ("Equity Unit"). Payment for Equity Units could be made by cash or promissory note. Under the Equity Plan, purchasers were obligated eventually to resell their Equity Units to Warner at a resale price roughly equal to the aggregate book value of the common stock contained in the Units. The Equity Plan gave the Executive Compensation Committee of Warner's board of directors the discretion to modify the resale price under certain circumstances. In addition to purchases under the Equity Plan, Warner's top managers also were issued, at various times, options to purchase shares of Warner common stock at various specified prices.
 
 
 9
 The complaint alleged that, as of March 31, 1989, Ross, Payson, Johnson, and Wasserman collectively held Equity Units representing nearly 700,000 shares of Warner common stock, purchased at an average price of about $10.00 per share, and that the resale price as of that date was $5.19 per share. The complaint also alleged that Adelson, Johnson, Payson, and Wasserman collectively held options to purchase over 800,000 shares of Warner common stock.
 
 
 10
 The Amended Merger Agreement contemplated substantial changes in the Equity Plan and stock option program. It provided that, just prior to the second-step merger, Warner's Executive Compensation Committee would adjust the resale price of the Equity Units to $70.00 per share, thus matching the anticipated value of the Merger Consideration, although management's resale of shares was for all cash. It also provided that upon consummation of the merger, outstanding Warner stock options would be cancelled in exchange for an amount of cash equal to $70.00 per share, less the exercise price of the option. Warner's top executives thus received $70.00 in cash for each of the Warner shares represented by their Equity Units and stock options, whereas Kramer and other shareholders received securities trading at $61.75 for their shares.
 
 
 11
 On March 2, 1990, defendants moved to dismiss the complaint pursuant to Fed.R.Civ.P. 9(b) and 12(b)(6). In support of their motion, defendants submitted an affidavit that included the following exhibits: the Original Merger Agreement, as annexed to Warner's Form 8-K Current Report filed with the SEC; the Joint Proxy Statement, as filed by Warner with the SEC; the Amended Merger Agreement and the Offer to Purchase as annexed to Time's Schedule 14D-1 dated June 16, 1989 and filed with the SEC; Warner's Schedule 14D-9 dated June 16, 1989 and filed with the SEC; and the Equity Plan, as annexed to the 1982 Warner Proxy Statement and filed with the SEC. Defendants also submitted copies of the complaints against them in two related state cases, and included a transcript of proceedings in one of those cases. The district court heard argument on the motion to dismiss on July 26, 1990 and issued a written opinion and order granting the motion on October 24, 1990.
 
 
 12
 With regard to Time's June 19, 1989 Offer to Purchase, Kramer's complaint alleged three fraudulent misrepresentations or omissions in violation of Section 14(e) of the Williams Act, Section 10(b) of the Exchange Act, and SEC Rule 10b-5. First, Kramer alleged that the Offer to Purchase suggested to Warner shareholders that the Merger Consideration would be at least partly in cash and would be worth $70.00 per share even though defendants knew at the time that no cash would be offered and that the value of the Securities Packages would be less than $70.00. As to the content of the Merger Consideration, the district court found that no valid claim for relief had been stated because Kramer had failed to allege any misrepresentation. The court observed that the language in the Offer to Purchase--"cash or debt or equity"--did not imply that the consideration necessarily would contain cash. As to the value of the Merger Consideration, the district court held that Kramer had not adequately pleaded scienter. It ruled that allegations that (1) the individual defendants received cash and not securities pursuant to the adjustments in the Equity Plan and stock option program and that (2) the Securities Package began trading at $61.75 rather than $70.00 did not state a claim for fraud with sufficient particularity.
 
 
 13
 Second, Kramer alleged that the Offer to Purchase falsely asserted that the Equity Plan authorized the raising of the resale price for the Equity Units in the event of a merger. The district court dismissed this claim on the ground that Kramer had failed to allege the omission of any material term of the proposed alterations to the Equity Plan. The court ruled that the Offer to Purchase fully disclosed that the resale price would be reset to equal the value of the Merger Consideration and that defendants were under no obligation to characterize the legality of this change.
 
 
 14
 Third, Kramer alleged that the Offer to Purchase misled Warner shareholders by stating that the Warner board of directors recommended acceptance of the tender offer without adequately disclosing a conflict of interest on the part of the individual defendants in making their recommendation. Specifically, Kramer alleged that the Offer to Purchase merely stated that the price would be reset to $70.00 and did not mention the then current resale price, the number of shares held by the individual defendants, or the original purchase price. These omissions, Kramer asserted, concealed the magnitude of the profits accruing to the individual defendants from the adjustment of the resale price in the Equity Plan. The district court dismissed this claim on the ground that the pertinent information was contained in the Joint Proxy Statement sent to Warner shareholders approximately three weeks before the Offer to Purchase was mailed. Relying upon Data Probe Acquisition Corp. v. Datatab, Inc., 722 F.2d 1, 4 (2d Cir.1983), cert. denied, 465 U.S. 1052, 104 S.Ct. 1326, 79 L.Ed.2d 722 (1984), the court ruled that the conflict of interest had been adequately disclosed because "[t]he Offer to Purchase made several references to the Joint Proxy Statement, thereby incorporating it by reference."
 
 
 15
 In addition to allegations of fraudulent misrepresentation, Kramer asserted a set of claims charging violations of Section 14(d)(7) of the Williams Act and SEC Rules 14d-10 and 10b-13. These claims were based on the premise that the adjustments to the Equity Plan and stock option program and resale of top management's shares were part of Time's tender offer. Because the adjustments allowed top management to receive a cash price equivalent to $70.00 per share while ordinary Warner shareholders were receiving the Securities Package worth $61.75 in exchange for their shares, Kramer alleged that this difference in treatment violated the "best price" provisions of Section 14(d)(7) and Rule 14d-10 as well as the prohibition on "side purchases" of Rule 10b-13. The district court dismissed these claims on the ground that the Equity Plan and stock option adjustments were made by Warner, not Time, and occurred some five months after the completion of the tender offer.
 
 
 16
 Having disposed of all of Kramer's federal claims, the district court dismissed the complaint without ruling on class certification. Kramer appealed, and we affirm.
 
 DISCUSSION
 
 17
 A. Consideration of Matters Outside of the Complaint
 
 
 18
 Kramer contends that in considering the motion to dismiss, the district court improperly relied upon factual sources outside the complaint--specifically the Offer to Purchase, the Joint Proxy Statement, and assertions of the defendants regarding the state of the junk bond market in October 1989 and related state litigations. The arguments based on bond market prices and related state litigation are quibbles and give us little pause. However, the references to the Offer to Purchase and Joint Proxy Statement raise substantial issues and serve as an occasion to fashion a clear rule governing the consideration of publicly filed disclosure documents when deciding motions to dismiss securities fraud actions.
 
 
 19
 In considering a motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6), a district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference. Of course, it may also consider matters of which judicial notice may be taken under Fed.R.Evid. 201. If a district court wishes to consider additional material, Rule 12(b) requires it to treat the motion as one for summary judgment under Rule 56, giving the party opposing the motion notice and an opportunity to conduct necessary discovery and to submit pertinent material. See Goldman v. Belden, 754 F.2d 1059, 1065-66 (2d Cir.1985); Ryder Energy Distribution Corp. v. Merrill Lynch Commodities Inc., 748 F.2d 774, 779 (2d Cir.1984).
 
 
 20
 In the instant matter, the district court made a brief reference, in two footnotes, to the condition of the junk bond market and related state litigation that were referred to in the supplementary materials offered by defendants. First, in ruling that the fact that the Securities Package opened trading at $61.75 instead of $70.00 was not a legally sufficient allegation of an intent to defraud, the district court observed:
 
 
 21
 Defendants suggest that the reason for the low trading price was the widely-publicized collapse of the junk bond market in October, 1989. See Defendants' Reply Memorandum of Law at 2, 16-17, tr. 8.
 
 
 22
 However, the district court did not rely on the truth of defendants' assertion in deciding the issue of intent. The alleged market collapse was merely an example of why a naked allegation of a lower than expected trading price in a fluid and ever-changing market does not imply, much less sufficiently allege, scienter. The illustrative reference to the condition of the junk bond market was thus not a ground for decision and does not run afoul of the rule that a district court must confine itself to the four corners of the complaint when deciding a motion to dismiss under Rule 12(b)(6).
 
 
 23
 Second, in stating that, while Kramer may have legitimate state law claims, his complaint did not contain a valid federal claim, the district court observed:
 
 
 24
 Indeed, defendants' Memorandum of Law indicates that litigation concerning the claims raised in this complaint is currently underway in the state courts, and that plaintiff's counsel in this case is also heavily involved in that litigation. See Defendants' Memorandum of Law at 8.
 
 
 25
 We do not pause to ask why judicial notice could not have been taken of the related litigation, see infra this subpart, because the district court placed no evidentiary reliance on the fact of such such litigation but merely illustrated its point that the instant suit had no place in federal court.
 
 
 26
 In contrast, the district court relied squarely on the Offer to Purchase and Joint Proxy Statement in dismissing the complaint. Kramer argues that such reliance was improper because those documents were not part of the complaint. Relying upon Cosmas v. Hassett, 886 F.2d 8 (2d Cir.1989), and Goldman v. Belden, supra, Kramer argues that the complaint's limited quotation of the Offer to Purchase did not sufficiently incorporate that document by reference to allow the district court to consider the entire document. He also argues that the Offer to Purchase did not incorporate the Joint Proxy Statement so as to allow the district court also to rely upon that.
 
 
 27
 Despite Cosmas and Goldman, it is highly impractical and inconsistent with Fed.R.Evid. 201 to preclude a district court from considering such documents when faced with a motion to dismiss a securities action based on allegations of material misrepresentations or omissions. First, the documents are required by law to be filed with the SEC, and no serious question as to their authenticity can exist. Second, the documents are the very documents that are alleged to contain the various misrepresentations or omissions and are relevant not to prove the truth of their contents but only to determine what the documents stated. Third, a plaintiff whose complaint alleges that such documents are legally deficient can hardly show prejudice resulting from a court's studying of the documents. Were courts to refrain from considering such documents, complaints that quoted only selected and misleading portions of such documents could not be dismissed under Rule 12(b)(6) even though they would be doomed to failure. Foreclosing resort to such documents might lead to complaints filed solely to extract nuisance settlements. Finally, we believe that under such circumstances, a district court may take judicial notice of the contents of relevant public disclosure documents required to be filed with the SEC as facts "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b)(2). This of course includes related documents that bear on the adequacy of the disclosure as well as documents actually alleged to contain inadequate or misleading statements. We stress that our holding relates to public disclosure documents required by law to be filed, and actually filed, with the SEC, and not to other forms of disclosure such as press releases or announcements at shareholder meetings.
 
 
 28
 The practice of taking judicial notice of public documents is not new. For example, in Decker v. Massey-Ferguson, Ltd., 681 F.2d 111, 113 (2d Cir.1982), we considered an annual report alleged to contain fraudulent misrepresentations to determine what statements it contained. Also, courts routinely take judicial notice of documents filed in other courts, again not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings. See, e.g., United States v. Walters, 510 F.2d 887, 890 n. 4 (3d Cir.1975) (on review of denial of habeas corpus, judicial notice of briefs and petitions filed in state courts to determine whether petitioner had exhausted his state remedies). Neither Cosmas nor Goldman addressed the question of whether judicial notice might be taken of publicly filed documents and therefore do not bind us on the instant appeal. Nevertheless, we note that tension exists between the result in the present case and the results in Cosmas and Goldman and have, therefore, circulated this opinion to the active judges of this court before filing. See Germain v. Connecticut National Bank, 926 F.2d 191, 194 (2d Cir.1991).
 
 
 29
 In the instant matter, the Offer to Purchase and the Joint Proxy Statement were part of public disclosure documents filed with the SEC, and the plaintiff was put on notice by the defendants' proffer of the documents that the district court might consider them. See Fed.R.Evid. 201(e). We thus conclude that the district court did not err by referring to the Offer to Purchase and the Joint Proxy Statement in considering the motion to dismiss.
 
 
 30
 B. Claims Alleging Material Misrepresentations or Omissions
 
 
 31
 Appellant argues that the complaint adequately stated that the Offer to Purchase violated Sections 10(b)[2] and 14(e)[3] and SEC Rule 10b-5[4] by (1) falsely representing the form and value of the Merger Consideration, (2) falsely representing that defendants were entitled to receive those benefits, and (3) failing to disclose the magnitude of the benefits the individual defendants would receive as a result of the adjustments to the Equity Plan and stock option program. We disagree.
 
 
 32
 1. Disclosure Concerning The Merger Consideration
 
 The complaint stated:
 
 33
 [T]he Offer to Purchase represented to the Class members that the Merger Consideration would, in fact, be worth about $70 per share, and that there was a reasonable chance that the Merger Consideration would consist of cash, at least in part. Such representations were false, because, at the time the Offer to Purchase was issued, Time and the other defendants knew or recklessly disregarded the fact that (i) Time would not agree to exchange in the Merger a package of securities and cash worth $70 for each Share, (ii) the value of the Merger Consideration would be less than $62 per share not $70, and (iii) the Merger Consideration would consist entirely of securities.
 
 
 34
 Given the requirement of Fed.R.Civ.P. 9(b) that allegations of fraud must be made with particularity, this allegation fails to state a claim for relief.
 
 
 35
 The Offer to Purchase misrepresented neither the form nor the value of the Merger Consideration actually received. It stated that the consideration would consist of "cash or debt or equity securities" or some combination thereof "having a value (in the case of [securities], on a fully distributed basis), per share ... equal, as nearly as practicable, in the opinion of two investment banking firms of national reputation," to $70.00. Listing cash as one of several possible forms of yet-to-be-defined consideration does not imply that cash will or will not, in fact, be offered.
 
 
 36
 As for value, the Offer to Purchase did not promise that the Merger Consideration would, when issued, trade at $70.00. It promised only that two investment banks would opine that the Merger Consideration would have that value. The fact that the Securities Package actually traded at only $61.75, therefore, does not render the statements in the Offer to Purchase misrepresentations. As we recently stated:
 
 
 37
 [T]he issue is simply whether a complaint states a cause of action under federal securities laws by alleging that defendants represented that securities to be issued would, in the opinion of financial advisors, have a specified market value and that the securities, when issued, did not attain the hoped for value.... [T]he answer is no.
 
 
 38
 Friedman v. Mohasco Corp., 929 F.2d 77, 79 (2d Cir.1991).
 
 
 39
 Nevertheless, even if the Securities Package did comport with the literal language of the Offer to Purchase, the Offer might still be fraudulent if defendants knew with absolute certainty at the time of its dissemination that the Merger Consideration would contain no cash whatsoever or be worth less than $70.00. It may be a fraud to suggest as possible what one knows to be flatly impossible. In this case, however, there has been no sufficient allegation of such scienter. See generally, Ernst & Ernst v. Hochfelder, 425 U.S. 185, 205-06, 96 S.Ct. 1375, 1386-87, 47 L.Ed.2d 668 (1976). Under Fed.R.Civ.P. 9(b), a complaint alleging fraud may aver intent generally, but "it must nonetheless allege facts which give rise to a strong inference that the defendants possessed the requisite fraudulent intent." Cosmas, 886 F.2d at 12-13 (citing Beck v. Manufacturers Hanover Trust Co., 820 F.2d 46, 50 (2d Cir.1987), cert. denied, 484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988), overruled on other grounds, United States v. Indelicato, 865 F.2d 1370 (2d Cir.) (en banc)), cert. denied, --- U.S. ----, 110 S.Ct. 56, 107 L.Ed.2d 24 (1989). Kramer argues that a "strong inference" can be drawn from allegations that, under the Amended Merger Agreement, Warner exchanged cash and not securities for the individual defendants' Equity Plan and stock option interests and that the Securities Package issued to Warner shareholders traded at only $61.75. The only strong inference to be drawn from the first allegation, however, is that the individual defendants preferred cash to securities and were aware that some cash resources would be depleted when Warner bought out their Equity Units and stock options. It is sheer speculation to conclude that they also knew with absolute certainty that no cash whatsoever could be offered and that the Securities Package would be worth less than $70.00. Additionally, we agree with the district court that no reasonable conclusion as to state of mind may be drawn from the fact that the market price of a security deviated from earlier expectations. It is in the very nature of securities markets that even the most exhaustively researched predictions are fallible.
 
 
 40
 2. Disclosure Concerning Adjustments to the Equity Plan
 
 The complaint stated:
 
 41
 The Offer to Purchase failed to make such full and fair disclosure with respect to the Equity Plan. The Offer to Purchase states that the Amended Merger Agreement provides that, "as contemplated by the Equity ... Plan, the committee administering such Plan may adjust the 'Book Value Per Share' and the 'Resale Price' to equal, effective immediately prior to consummation of the Merger, the Merger Value [i.e., $70 per Plan Share] ... and shall make such other changes as it deems appropriate to give effect to the Merger." Such statement was false, because the provision of the Equity Plan permitting the Committee to raise the Resale Price, quoted in paragraph 13 above, does not permit the Committee to raise the Resale Price from $5.19 per Plan Share to $70 per Plan Share, effective immediately prior to the consummation of the Merger.
 
 
 42
 Kramer thus argues that the Offer to Purchase fraudulently failed to characterize the adjustment to the Equity Plan as illegal. This, however, does not state a claim under Sections 14(e) or 10(b) or Rule 10b-5. The purpose of the antifraud provisions is disclosure, not substantive review by federal courts of corporate affairs. See Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 479, 97 S.Ct. 1292, 1304, 51 L.Ed.2d 480 (1977). "The disclosure required ... is not a rite of confession.... What is required is the disclosure of material objective factual matters." Data Probe, 722 F.2d at 5-6. The Offer to Purchase disclosed in clear terms that just before the merger, Warner would be resetting the resale price to equal the expected value of the Merger Consideration and that this adjustment was consistent with defendants' reading of the Equity Plan. That sufficiently informed Warner shareholders of the substance of the proposed adjustment. No more was required. If a shareholder wished to contest the legality of the adjustment, the disclosure provided all the information necessary to bring an action under state law. See Goldberg v. Meridor, 567 F.2d 209, 219-21 (2d Cir.1977). Kramer may not transform that state law breach of contract or fiduciary duty action into a fraud claim under the federal securities laws. See Santa Fe Indus., Inc., 430 U.S. at 479, 97 S.Ct. at 1304.
 
 
 43
 3. Disclosure Concerning Warner Management's Conflict of Interest
 
 
 44
 Time's Offer to Purchase did sufficiently state that Warner's top management would, just before consummation of the second-step merger, be allowed to resell at a profit shares acquired through the Equity Plan or stock options to Warner. It did not, however, state how many shares were held by each individual defendant or the differences between the purchase and resale price. Kramer thus alleged that the Offer to Purchase omitted material facts in failing to disclose the magnitude of the profits to the individual defendants under the adjustments to the Equity Plan. Kramer argues that had he known that the individual defendants owned Equity Units representing thousands of shares of Warner stock, the resale price of which would be adjusted from $5.19 to $70.00 per share, he would have viewed the Warner directors' recommendation to accept Time's offer differently. We conclude, however, that in light of the various disclosures made to the Warner shareholders, this claim fails.
 
 
 45
 That inside directors stand to gain from a recommended transaction is material information that must be disclosed to shareholders considering a tender offer. See, e.g., Data Probe, 722 F.2d at 5. Moreover, we may assume for purposes of our decision that there is reasonable likelihood that the magnitude of such a gain would be considered important by the reasonable investor in deciding how to act and is thus also material information. See TSC Industries v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976); Basic Inc. v. Levinson, 485 U.S. 224, 231-32, 108 S.Ct. 978, 983-84, 99 L.Ed.2d 194 (1988). Appellees argue that Time's Offer to Purchase adequately disclosed the magnitude of the individual defendants' financial interests in seeing the merger consummated because it referred at several places to the May 22 Joint Proxy Statement, which did adequately disclose the nature of their financial interest. In making this argument, appellees rely heavily upon a statement in Data Probe indicating that a financial interest on the part of management in that case was disclosed by a letter's incorporation by reference of a merger agreement containing the relevant information. 722 F.2d at 5.
 
 
 46
 We do not read Data Probe as broadly as appellees, however. The issue in Data Probe was whether management was required to state that its financial interest caused them to recommend the transaction in question. We held that, so long as management fully disclosed its interest, it need have said no more about its personal motives. In so ruling, we observed in passing that the disclosure of management's financial interest had occurred when the letter incorporated by reference the terms of the merger agreement. However, whether the incorporation by reference sufficed to make a disclosure adequate under federal securities law appears not to have been disputed in Data Probe, and the passing remark describing the fact of incorporation by reference was hardly a blanket approval of disclosing material information by that method. The documents so incorporated may be difficult to obtain and, depending on the nature of the information and other circumstances, incorporation by reference may complicate analysis. Indeed, at least where the SEC by regulation or other authoritative act has not approved disclosure through incorporation by reference, see, e.g., SEC Rule 12b-23, 17 C.F.R. Sec. 240.12b-23 (1990), the practice should be restricted to circumstances in which no reasonable shareholder can be misled.
 
 
 47
 Time's Offer to Purchase, viewed in isolation, is arguably deficient under this test. Although there are several references in the Offer to Purchase to the Joint Proxy Statement, none of them specifies that the Joint Proxy Statement contains detailed information concerning the magnitude of the individual defendants' financial interests in consummation of the merger or directs the reader to the pertinent portion of the Joint Proxy Statement. One thus might question whether the wholesale incorporation of the Joint Proxy Statement by reference in Time's Offer to Purchase sufficed to meet the requisite standard of disclosure concerning management's conflict of interest.
 
 
 48
 However, on the same day the Offer to Purchase was mailed to the Warner shareholders, June 19, 1989, Warner, pursuant to SEC Rule 14d-2, sent its shareholders a letter recommending acceptance of Time's offer. Accompanying the letter was a Schedule 14D-9 recommendation statement filed with the SEC. For reasons stated in subpart A of this opinion, supra, we may consider this document in disposing of this appeal. The Schedule 14D-9 incorporated by specific reference the relevant portions of the Joint Proxy Statement describing "certain contracts, agreements, arrangements or understandings between [Warner] ... and certain of [its] directors ... [and] executive officers." Although not ideal, this disclosure was clearly sufficient under the circumstances.
 
 
 49
 The Warner Schedule 14D-9 was, so far as the conflict of interest of the individual defendants is concerned, the document most pertinent to that issue. It was the very embodiment of the act to which the conflict was relevant--the recommendation to Warner shareholders to accept Time's tender offer to be followed by the merger--and disclosure in this document sufficed to alert any interested Warner shareholder to the existence of that conflict. Moreover, although the magnitude of the conflict was disclosed in the Schedule 14D-9 by incorporating by reference the pertinent portions of the Joint Proxy Statement, no reasonable shareholder could have been misled or confused as to that magnitude.
 
 
 50
 First, the Joint Proxy Statement was barely three weeks old when the Schedule 14D-9 was mailed and had been sent to every Warner shareholder. No claim is made that either Kramer or the putative class had not received the Joint Proxy Statement because they had purchased stock after its mailing. Second, the Schedule 14D-9 and Joint Proxy Statement both related to ongoing negotiations between the same two companies concerning a corporate combination in one form or another. Interested shareholders had similar incentives to read both documents, and even if an interested shareholder had for some reason failed to read the Joint Proxy Statement but was nevertheless interested in the conflict of interest, that shareholder would have been alerted by the Schedule 14D-9 to the existence, availability and location of the pertinent information in the earlier document. Third, there is no hint of any intent to deceive. Both Time and Warner expected that the Joint Proxy Statement would be the principle disclosure to shareholders concerning their merger, and the Statement fully disclosed all material information. It contained a list of the number of shares held by each individual defendant--100,000 to 300,000--the average purchase price per share--$9.26 to $10.27--and the book value per share as of March 31, 1989--$5.19. This disclosure enabled any interested shareholder to calculate immediately the enormous gains to the individual defendants resulting from the merger agreement. Indeed, it is fair to say that this disclosure is the basis for many of the allegations in the instant matter and in the related state litigation.
 
 
 51
 In such circumstances, we believe that a "no-harm, no-foul" rule applies to the failure of Time's Offer to Purchase to disclose the magnitude of the interests of the individual defendants. Whatever the deficiency, if any, of Time's disclosure when viewed in isolation, it was cured by the overall disclosure to the Warner shareholders, and the purpose of the federal securities laws in regulating such disclosure was effectuated.
 
 
 52
 C. Violations of the "Best Price" Provision of the Williams Act
 
 
 53
 Relying upon various statutory provisions and regulations promulgated by the SEC and set out in the margin,[5] Kramer argues that the complaint states a claim for relief because the adjustments to the Equity Plan and stock option programs enabled the individual defendants to receive the equivalent of $70.00 per share in cash for their interest in Warner, even though holders of outstanding Warner stock received a Securities Package worth only $61.75 per share.
 
 
 54
 However, as the district court noted, the tender offer provisions apply only to tender offers and tender offerors, and it was Warner, the target, rather than Time, the offeror, that cashed out the individual defendants' Equity Units and stock options. This occurred, moreover, well after the expiration of the tender offer.
 
 
 55
 Kramer argues that Field v. Trump, 850 F.2d 938, 944-45 (2d Cir.1988), cert. denied, 489 U.S. 1012, 109 S.Ct. 1122, 103 L.Ed.2d 185 (1989), requires an opposite conclusion. We disagree. In Field, the offeror "withdrew" an outstanding tender offer one evening, privately obtained an option on a large bloc of the target's stock that night, and renewed the tender offer at a higher price the next morning. When the payment for the option, a reimbursement for expenses and the exercise price (identical to the higher price in the "new" tender offer) were taken into account, the owner of the bloc received $1.50 more per share than other tendering shareholders. We held that the complaint stated a valid claim under Section 14(d)(7) of the Williams Act and SEC Rules 14d-10 and 10b-13 because a trier could find that the transaction was a single tender offer with tendering shareholders receiving different prices. See id., 850 F.2d at 945.
 
 
 56
 In Field, however, allegedly different prices were paid by the offeror, whereas in the instant matter Warner, rather than Time, purchased the shares from its top management. Also, although the Williams Act does not define tender offers, we perceive no basis in the language, structure or legislative history of the Act for viewing a second-step statutory merger following a successful tender offer for 51 percent of a target's shares as a continuation of the tender offer. Such a merger lacks the most salient characteristics of a tender offer--an offer to purchase, tender and acceptance. Moreover, state and federal law clearly treat mergers as distinct from tender offers. Statutory mergers are authorized and regulated by state corporation codes, and federal regulation of such mergers is found in federal regulations concerning the solicitation of proxies. See, e.g., SEC Schedule 14A, 17 C.F.R. Sec. 240.14a-101 (1990). Finally, the Williams Act contains, in addition to the "best price" provision, time limits, disclosure requirements, pro rata acceptance rules, and provisions for withdrawal of tendered shares that make no sense whatsoever in the merger context. The claim that the Williams Act applies to second-step statutory mergers is thus meritless.
 
 CONCLUSION
 
 57
 For the reasons stated above, we affirm the order of the district court dismissing the complaint.
 
 
 
 [1]
 For a full presentation of the facts leading up to the merger, see Paramount Communications, Inc. v. Time Inc., 571 A.2d 1140 (Del.1989)
 
 
 [2]
 Section 10(b) states that "[i]t shall be unlawful for any person ... [t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device." 15 U.S.C. Sec. 78j(b) (1988)
 
 
 [3]
 Section 14(e), added to the Exchange Act by the Williams Act of 1968, provides that:
 [i]t shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer.
 15 U.S.C. Sec. 78n(e) (1988).
 
 
 [4]
 Rule 10b-5 states that
 [i]t shall be unlawful for any person ...
 (a) To employ any device, scheme, or artifice to defraud,
 (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.
 
 
 [17]
 C.F.R. Sec. 240.10b-5 (1990)
 
 
 [5]
 Section 14(d)(7) of the Williams Act, the "best price" provision, provides
 Where any person varies the terms of a tender offer or request or invitation for tenders before the expiration thereof by increasing the consideration offered to holders of such securities, such person shall pay the increased consideration to each security holder whose securities are taken up and paid for pursuant to the tender offer or request or invitation for tenders....
 15 U.S.C. Sec. 78n(d)(7) (1988). Promulgated under Section 14(d)(7), Rule 14d-10 states
 (a) No bidder shall make a tender offer unless: ... (z) The consideration paid to any security holder pursuant to the tender offer is the highest consideration paid to any other security holder during such tender offer.
 
 
 [17]
 C.F.R. Sec. 240.14d-10 (1990). The SEC has also promulgated Rule 10b-13, which provides:
 (a) No person who makes a cash tender offer ... shall, directly or indirectly, purchase, or make any arrangement to purchase, any such security (or any other security which is immediately convertible into or exchangeable for such security), otherwise than pursuant to such tender offer or exchange offer, from the time such tender offer or exchange offer is publicly announced or otherwise made known by such person to holders of the security to be acquired until expiration of the period....
 
 
 [17]
 C.F.R. Sec. 240.10b-13 (1990)