**BEDFORD AFFILIATES, Plaintiff,**

v.

**Harvey MANHEIMER, Beverly Manheimer, and Richard Sills, Defendants.**

**Bedford Affiliates, Petitioner,**

v.

**The Home Insurance Company, Respondent.**

**No. CV–95–0116 (JM).**

United States District Court,
E.D. New York.

March 24, 1999.

Del Gadio & Tomao, Uniondale, NY, by Robert G. Del Gadio, for plaintiff.

Rivkin, Radler & Kremer, Harvey Manheimer and Beverly Manheimer, Uniondale, NY, by Charlotte Biblow, for defendants.

Jacobs Persinger & Parker, New York City, by Michael Bayda, for defendant Richard Sills.

Jean–Pierre D. Van Lent, New York City, for respondent Home Insurance Co.

Memorandum of Decision and Order

MISHLER, District Judge.

Bedford Affiliates ("BEDFORD") filed a petition in a supplementary proceeding pursuant to Fed.R.Civ.P. 69(a) and N.Y. CPLR § 5227 against the Home Insurance Company ("HOME"), seeking payment of the balance due from defendant Richard Sills ("SILLS"). The petition is based on the judgment entered in the above case on August 6, 1997, as modified by order dated December 4, 1998 increasing the judgment amount by $13,756. The petition also seeks payment of remediation expenses incurred since trial. Bedford claims that the amount due for expenses between May 27, 1997 and December 15, 1997 is $48,471.71 (Sills is charged with $46,048.12).

The petition alleges liability based on two commercial general liability insurance policies issued by Home [1] for the following coverage periods: BOP–8 785372—5/8/80 to 5/8/83 and BOP–8 901137—5/8/83 to 5/8/86. Home moves to dismiss the petition pursuant to Fed.R.Civ.P. 12(b)(1) (lack of jurisdiction over the subject matter) and 12(b)(6) (failure to state a claim upon which relief can be granted). The court denies the motion to dismiss for lack of subject matter jurisdiction.

Sills by Michael Bayda, Esq., Jacobs Persinger & Parker (substituted in place of Robert L. Tofel, Esq., Tofel Berelson Saxl and Partners, P.C.), interposes an amended cross claim against Home seeking reimbursement for any and all sums he is obligated to pay or does pay pursuant to the judgment.[2] Harvey Manheimer and Beverly Manheimer assert a claim against Home, in the event they become liable to Bedford under the terms of the judgment.

## BACKGROUND

On May 16, 1995, by letter to Sills, Home acknowledged "... receipt of [Sills'] notice of claim made on the part of Ron-Glen Cleaners Corporation ..." The letter advised Sills that Home was reviewing his notice to determine "... whether [it] has a duty to defend against any suit arising out of the claim or to indemnify for any loss that may result from it." Home, through its agency Risk Enterprise Management Limited ("REM"), agreed to pay the legal services and reasonable and necessary costs incurred by RonGlen (Sills) for services rendered by Rosenman & Colin, in a letter dated October 27, 1995. The letter reserved Home's right to contest its obligation to defend or indemnify RonGlen and the right to withdraw from the defense of RonGlen. By letter dated December 8, 1997, Home withdrew from the defense of Sills, and Jean-Pierre D. Van Lent, Esq. who had been retained by Home on November 24, 1997, substituted for Rosenman & Colin, LLP (Richard G. Leland, Esq.).

### The Insurance Policies

#### A.  The Exclusions

The terms of the policies relating to pollution are identical and the caption "Exclusions" to the policies states, *inter alia:*

PROVISIONS APPLICABLE TO SECTION II GENERAL LIABILITY COVERAGE  E—COMPREHENSIVE GENERAL LIABILITY—BODILY INJURY LIABILITY AND PROPERTY DAMAGE LIABILITY COVERAGES

1.  The company will pay on behalf of the **Insured** all sums which the **In-**

---

1.  The insured is listed as Ron–Glen Cleaners Corp., d/b/a RonGlen Cleaners. We previously found that Sills, who has the benefit of the policies issued in the name of the corporation, is liable for the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA") violations of the corporation.

2.  Sills' amended cross-claim seeks payment for legal services rendered and costs disbursed for his representation in the main action by Rosenman & Colin, L.L.P. (by Richard G. Leland, Esq.) Jacobs Persinger & Parker (by Michael Bayda) seeks attorneys' fees for services rendered to Sills subsequent to December 8, 1997, upon substitution for Rosenman & Colin, L.L.P.

sured shall become legally obligated to pay as damages because of

**bodily injury or property damage**

to which this insurance applies, caused by an **occurrence,** and the company shall have the right and duty to defend any suit against the **Insured** seeking damages on account of such **bodily injury** or **property damage,** even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.

**Exclusions**

**This insurance does not apply:**

\*      \*      \*      \*      \*      \*

(f) **to bodily injury or property damages** arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental;

\*      \*      \*      \*      \*      \*

## III. LIMITS OF LIABILITY

\*      \*      \*      \*      \*      \*

**Bodily Injury** and **Property Damage**— For the purpose of determining the limit of the company's liability, all **bodily injury** and **property damage** arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one **occurrence.**

\*      \*      \*      \*      \*      \*

## CONDITIONS APPLICABLE TO SECTION II

\*      \*      \*      \*      \*      \*

**4. Insured's Duties in the Event of Occurrence, Claim or Suit.**

(a) In the event of an **occurrence,** written notice containing particulars sufficient to identify the **Insured** and also reasonably obtainable information with respect to the time, place and circumstances thereof and the names and addresses of the injured and of available witnesses shall be given by or for the **Insured** to the company or any of its authorized agents as soon as practicable.

\*      \*      \*      \*      \*      \*

## GENERAL CONDITIONS

The following Conditions apply to Sections I, II and III except as otherwise indicated. Additional Conditions or modifications of the following Conditions may appear in the specific coverage sections.

\*      \*      \*      \*      \*      \*

3. Concealment or Fraud: This policy is void if any Named Insured has intentionally concealed or misrepresented any material fact or circumstance relating to this insurance.

(Van Lent Aff., Exh. A.)

### B. *The Exception to the Exclusion*

We turn to the "pollutants into or upon land" exception to the exclusion "if such discharge, dispersal, release or escape is sudden and accidental." Home argues that the discharge of perc into the land of the site was within the exclusion from coverage. It relies on the record of the main trial.

Sills purchased approximately 2,500 gallons of perc each year during the fifteen (15) years that he operated the dry cleaning business at the site. It is uncontested that, from the time Sills opened the dry cleaning business at the site on July 1, 1973 to March 1988 when D & L and Mr. Oh took over the operation of the dry cleaning business, perc was deposited in the land routinely.

Home points to Sills' knowledge of the use of perc, and of its hazardous and toxic

nature, to show that it polluted the land. Home also cites evidence showing that: 1) the dry cleaning equipment was old and incapable of retaining the perc used in dry cleaning, 2) the structure of the building in which the business operated favored releasing the perc from inside into an open trench in close proximity to the operating equipment, and 3) the perc ultimately found its way into the soil of the site.

Bedford argues, based on the testimony of Michael Tatch, "who was called by Sills and presumably paid by Home," that all the incidents in which perc polluted the soil "would have been sudden and accidental, that is, unintended and unexpected." (Bedford's Mem. filed February 20, 1998, pp. 8–9.) These include spills "when the door to the dry cleaning machine leaks when a gasket becomes worn or if the bolt loosens," allowing the supply tank "to be overfilled and spill perc on the floor," and a leak in the seal of the supply tank that pumped "the perc from the tank to the dry cleaning machine." (*Id.*)

Bedford apparently accepts Tatch's statement "that the equipment at the Site had the ability to cause such leakage." (*Id.*) It notes that "Tatch confirmed that a 25 gallon spill of perc would be a significant spill." (*Id.*) Bedford's position on the issue of exclusion is:

> Thus during Sill's operation of the Site between 1973 and 1988 there were spills of hazardous substances or threats of spills of hazardous substances inside the building in connection with the operation of the dry cleaning business. Typically, such spills of hazardous substances would have been sudden and accidental, that is unintended and unexpected.

(*Id.*)

Home argues:

### 1. *The Black Hose*

The discharge of perc from the dryer-connected black hose to the ground outside

the building was intentional and therefore within the pollution exclusion.[3]

### 2. *The Faulty Door Gasket*

The perc spill from the faulty door gasket in the dry cleaning machine, which Sills continued to operate for approximately two days, falls squarely within the pollution exclusion. Continued operation of the perc-dripping machine over a period of days was clearly intentional.

### 3. *The Twenty-five Gallon Spill From Door Handle Failure*

The opening of the door during the wash cycle, when the door handle broke due to a lack of proper maintenance of the equipment, was a foreseeable event. (Home Mem. in Support of Motion to Dismiss, pp. 35 – 38).

### DISCUSSION

#### I. *Home's Arguments for Dismissal*

Home expresses doubt as to the propriety under New York Insurance Law § 3420(a)(2) and CPLR § 5227 of serving a petition within 30 days of the service of notice of the entry of judgment. Judgment in the amount of $338.413.59 was entered in favor of Bedford against Sills on August 6, 1997. A copy of the judgment was served on Home, by certified mail, on October 22, 1997. Bedford's petition was hand delivered to Home on November 19, 1997.

It is clear that CPLR § 5227 does not void a petition served within 30 days of the service of notice of entry of judgment. A right of action against Home under § 3420(a)(2) does not preclude a judgment creditor from seeking relief under CPLR 5227. *Guercio v. Hertz Corp.*, 40 N.Y.2d 680, 686, 389 N.Y.S.2d 568, 573, 358 N.E.2d 261 (1976). The court rejects Home's claim for dismissal based on New York Insurance Law § 3420(a)(2).

---

**3.** Bedford agrees. (*Id.*)

Home's other arguments for dismissal include:

1. Under the terms of the policies, pollution is excluded except if the problem is sudden and accidental. This exception does not apply.

2. The general liability policies on which the petition is based are void for the failure of Sills to inform Home of pollution to the site before the issuance of the policy effective May 8, 1980 to May 8, 1983 and the policy effective May 8, 1983 to May 8, 1986.

## II. *The Petition*

■ We consider Home's motion to dismiss as a motion under Fed.R.Civ.Pro. 12(b)(6). We recognize that the court normally may not consider matters outside the pleadings. However, since Bedford chose to bring this proceeding as part of the underlying action, it is proper for this court to consider the entire trial record in the main action. *Kramer v. Time Warner, Inc.,* 937 F.2d 767, 774 (2d Cir.1991). Both Bedford and Home have made reference to the trial record. *SeeBio–Tech. Gen. Corp. v. Genentech, Inc.,* 886 F.Supp. 377, 381 (S.D.N.Y.1995) (citing *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42 (2d Cir.1991), *cert. denied* 503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992)) ("Even on a Rule 12(b)(6) motion this court may properly take notice of documents outside of the four corners of the complaint"). The court finds no need to convert the motion to a motion for summary judgment.

The court's Memorandum of Decision dated August 6, 1997 found *inter alia* the following:

Sills was the sole officer, director and shareholder of RonGlen from the date of its incorporation on July 6, 1973, to the date of dissolution on September 29, 1989.

Under Sills' control, RonGlen occupied and operated the retail dry cleaning store at the Site from July 1, 1973 until March 30, 1988, using perc as the cleaning agent. Sills had extensive experience in the dry cleaning business prior to running Ron-Glen. He had been the sole shareholder and director of several other dry cleaning establishments and was, for 25 years, a member of the Neighborhood Dry Cleaning Association. He was aware of the hazardous nature of perc, the fact that its disposal by dumping or spilling was prohibited and that it was regulated as a hazardous substance by various government agencies.

From 1973 until 1988, during RonGlen's operation of the dry cleaning store, under Sill's direction, there were several releases of perc at the Site which caused the soil to become contaminated and hazardous. The first notification regarding contamination was in the form of a letter dated November 30, 1978 (the "1978 Notification Letter") which was received by Quarterman at the dry cleaning store from the Nassau County Department of Health (the "NCDOH"). The 1978 Notification Letter expressed concern over the leakage of perc from a black hose that came from the dryer and extended out the back of the building.

A second incident involved a 25 gallon perc spill into a dirt trench. At Sills' direction, Quarterman had the trench dug out to remove the contamination.... A third perc spill came from a drip from the dry cleaning machine caused by a faulty door gasket. Sills continued to operate the defective dry cleaning machine for approximately two days until a new gasket was ordered and replaced. Other discharges of perc occurred during Sills' use and occupation of the Site.... Other than Quarterman, Sills did not instruct his other employees as to how to handle perc, nor did he inform them of its hazardous nature.

## III. *The Duty to Defend*

■ The court in *Avondale Industries, Inc. v. The Travelers Indem. Co.,* 887 F.2d 1200, 1204–1205 (2d Cir.1989) states the well-settled standard on the insurer's duty to defend as follows:

An insurer's duty to defend and to indemnify are separate and distinct, and the former duty is broader than the latter. *See Technicon,* 74 N.Y.2d at 73, 544 N.Y.S.2d 531, 542 N.E.2d 1048; *Servidone,* 64 N.Y.2d at 424, 488 N.Y.S.2d 139, 477 N.E.2d 441; *Seaboard,* 64 N.Y.2d at 310, 486 N.Y.S.2d 873, 476 N.E.2d 272. The duty to defend rests solely on whether the complaint in the underlying action contains any allegations that arguably or potentially bring the action within the protection purchased. *Technicon,* 74 N.Y.2d at 73, 544 N.Y.S.2d 531, 542 N.E.2d 1048. So long as the claims alleged against the insured rationally may be said to fall within the policy coverage, the insurer must come forward and defend. *Id.*

New York courts have held, in addition, that an insurer seeking to avoid its duty to defend bears a heavy burden. "[B]efore an insurance company is permitted to avoid policy coverage, it must ... establish[ ] that the exclusions or exemptions apply in the particular case, and that they are subject to no other reasonable interpretation." *Seaboard,* 64 N.Y.2d at 311, 486 N.Y.S.2d 873, 476 N.E.2d 272; *see also Neuwirth v. Blue Cross & Blue Shield,* 62 N.Y.2d 718, 476 N.Y.S.2d 814, 465 N.E.2d 353 (1984) (mem.) (citations omitted). To avoid the duty therefore the insurer must demonstrate that the allegations in the underlying complaints are "solely and entirely" within specific and unambiguous exclusions from the policy's coverage. *See International Paper,* 35 N.Y.2d at 325, 361 N.Y.S.2d 873, 320 N.E.2d 619.

... Travelers can be excused from its duty to defend only if it can be determined as a matter of law that there is no possible basis in law or fact upon which the insurer might be held to indemnify Avondale. *See e.g. Villa Charlotte Bronte, Inc. v. Commercial Union Ins. Co.,* 64 N.Y.2d 846, 848, 487 N.Y.S.2d 314, 476 N.E.2d 640 (1985). Comparison must be made *de novo* between the alle-gations contained in the complaint or underlying action and the terms of the policy. *See National Grange Mut. Ins. Co. v. Continental Casualty Ins. Co.,* 650 F.Supp. 1404, 1408 (S.D.N.Y.1986); *Seaboard,* 64 N.Y.2d at 310–11, 486 N.Y.S.2d 873, 476 N.E.2d 272.

The court in *Northville Industries, Corp. v. National Union Fire Ins. Co.,* 89 N.Y.2d 621, 634, 679 N.E.2d 1044, 1049, 657 N.Y.S.2d 564, 569 (1997) further clarified the standard underlying the insurer's duty to defend:

In determining whether the underlying complaint can be read as even potentially bringing the claim within the sudden and accidental exception to the exclusion of pollution coverage, a court should not attempt to impose the duty to defend on an insurer through a strained, implausible reading of the complaint "that is linguistically conceivable but tortured and unreasonable" (*State of New York v. AMRO Realty Corp.,* 936 F.2d 1420, 1428 [2d Cir.][applying New York law] ). Moreover, a court may look to judicial admissions in the insured's responsive pleadings in the underlying tort action or other formal submissions in the current or underlying litigation to confirm or clarify the nature of the underlying claims (*see, Technicon Elecs. Corp. v. American Home Assur. Co.,* 74 N.Y.2d at 75, 544 N.Y.S.2d 531, 542 N.E.2d 1048, *supra* ).

Additionally, *International Paper Co. v. Continental Cas. Co.,* 35 N.Y.2d 322, 326–327, 361 N.Y.S.2d 873, 876, 320 N.E.2d 619 (1974) holds:

An insurer's obligation to furnish its insured with a defense is heavy indeed, and, of course, broader than its duty to pay. The rule to be followed is clearly set out in *Goldberg v. Lumber Mut. Cas. Ins. Co. of N.Y.,* 297 N.Y. 148, 154, 77 N.E.2d 131, 133, wherein this court wrote: 'Indeed, even in cases where the policies do not render the allegations by the injured party controlling, it has been

said: The distinction between liability and coverage must be kept in mind. So far as concerns the obligation of the insured to defend the question is not whether the injured party can maintain a cause of action against the insured but whether he can state facts which bring the injury within the coverage. If he states such facts the policy requires the insurer to defend irrespective of the insured's ultimate liability.'

### A. *The Amended Complaint and Sills' Answer*

The amended complaint charges Sills (through RonGlen) with a violation of CERCLA in the release or threatened release of hazardous substances at the site from July 1, 1973 through March 30, 1988 (¶¶ 12, 18).[4] Sills' answer is a denial of the allegations of pollution contained in paragraphs 12 and 18 of the amended complaint. The answer includes a counterclaim against Bedford which alleged that the pollution started prior to RonGlen's occupancy of the site on July 1, 1973. The counterclaim alleges joint and several liability.

### B. *Relevant Information Outside Pleadings*

On March 14, 1995, Mr. Leland hand delivered a copy of the summons and complaint to REM, Home's agent. In a letter to Sills, dated May 16, 1995, Home acknowledged receipt of Sills' notice of claim. The letter requested information concerning RonGlen's participation in polluting the site. It advised further that Home was reviewing the notice of claim "to determine whether Home has a duty to defend any suit arising out of the claim or to indemnify for any loss that may result from it."

By letter dated June 13, 1995, Sills answered Home's inquiry relating to pollution of the site as follows:

4. The amended complaint also contains a breach of contract claim, a claim for restitu-

2. RonGlen was in the business of operating a drycleaning establishment at the Site.

3. The Site was used as a drycleaning facility prior to RonGlen's operation. RonGlen did not become aware that there was any problem in connection with waste related activities conducted at the Site until it was served with a Summons and Complaint on or about February 1, 1995. RonGlen had no communication with any government agencies about the Site prior to its decision to sublease a portion of the Site.

4. RonGlen has not made any inquiries regarding the status of any permits or other regulatory authorizations for the Site.

\*   \*   \*   \*   \*   \*

6. According to the allegations set forth in the Complaint, the soil and groundwater at the Site have been contaminated with volatile organic compounds.

7. Since RonGlen has not conducted any environmental investigation of the Site, it is unable to estimate when and how contaminants were released at the Site or whether contaminants are continuing to impact the soil or groundwater at and around the Site. As set forth in Response No. 3 above, RonGlen first learned of contamination at the Site upon its receipt of the Summons and Complaint. The Complaint states that off-site public drinking water wells have been impacted.

According to the plaintiff in the above-captioned action, soil has been excavated and removed from the Site and further investigation into the impact to the groundwater at and around the Site will continue. In addition, the plaintiff has proposed a soil venting procedure to address contamination at the Site.

tion and a claim for indemnification against Sills, which are not relevant to the discussion.

In an October 27, 1995 letter to Sills' insurance broker, with copies to Sills and Leland, Home agreed to:

pay in conjunction with other insurers the reasonable and necessary costs incurred by RonGlen in defense of the allegations asserted against it in the litigation beginning on the date that notice of its claim was received by The Home. This determination is subject to the limitations and reservations of rights contained in this letter.

The letter stated further:

You have notified The Home that Richard Leland of Rosenman & Colin has been retained as RonGlen's independent counsel in connection with the litigation. Home has reporting requirements and procedures for independent counsel representing its insureds. The purpose of these requirements is to assist Home in determining whether its insureds are being represented properly, and whether the legal services charged to Home were reasonable and necessary. The requirements include periodic status reports, budgeting estimates and prior notice and approval of major expenditures. Home will forward the requirements under separate cover.

Home's defense payments are subject to a full reservation of rights to contest Home's obligation to defend or indemnify RonGlen in connection with the litigation. Home also expressly reserves the right to withdraw from the defense of RonGlen and to seek recovery of amounts that it pays. Home's coverage investigation is continuing, and Home may ultimately conclude that it has no obligations whatever to RonGlen in connection with the litigation.

\* \* \* \* \* \*

Please note that Home's reservation of rights is solely designed to preserve its rights under the policies. In it, Home neither affirms nor denies coverage with respect to policies BOP–8785372 or BOP–8901137. Rather, it identifies coverage issues and reserves its rights with respect to them. It is not intended to alter RonGlen's rights, and RonGlen need not take issue with Home's positions as outlined in this letter in order to preserve its rights under these policies.

\* \* \* \* \* \*

The definition of "property damage" also provides that the occurrence resulting in "property damage" must happen "during the policy period." Here, not only is "environmental contamination" in issue instead of "property damage," the information received by Home thus far does not indicate that the contamination happened during each of the Home policy periods.

In addition, exclusion (f) provides that the insurance does not apply:

to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids, or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

According to the Complaint, there was a "discharge, dispersal, release or escape," as that phrase is used in exclusion (f). Also, the allegations of the Complaint and reports discussed above suggest that the discharge(s), dispersal, release or escape may not have been "sudden and accidental," but rather by "reason of [RonGlen's] deliberate, intentional and willful discharge." (*See* Complaint at ¶ 17).

\* \* \* \* \* \*

For reasons set out in this letter, Home has determined that under policies BPO–P388302, BOP–P514637 and BOP–P388302, it can have no duty to defend RonGlen, to pay any defense costs that

RonGlen incurs, or to indemnify Ron-Glen in connection with this claim.

On November 27, 1997, Bedford filed its petition seeking payment from Home for the judgment debt filed against Sills. On December 11, 1997, the law firm of Tofel, Berelson, Saxl & Partners P.C. was retained to represent Sills in his claims against Home. Robert L. Tofel, Esq. filed a claim against Home based on Bedford's petition.[5] Jacobs Persinger & Parker (by Michael Bayda) was later substituted for Tofel Berelson Saxl & Partners, P.C. in representing Sills.

Sills' claim filed in the petition proceeding states that Home had agreed to pay a portion of the legal fees for services rendered in the main action. However, by letter dated December 8, 1997, Home withdrew from said agreement and from and after that date failed and refused to defend Sills in the main action or to pay all or any part of Sills' defense costs incurred after December 8, 1997 in respect of the defense of the main action. Moreover, Home refused and has failed to pay substantial claims by Rosenman & Colin, LLP for the costs of Sills' defense incurred prior to December 8, 1997, representing the difference between Rosenman & Colin's charges at its customary and normal hourly rates, and the amounts actually paid by Home.

We find that Sills' claims of sudden and accidental spills of perc from inside the building and seeping outside the building bring his claims "potentially within the protection purchased." *Technicon Elecs.*, 74 N.Y.2d at 73, 544 N.Y.S.2d 531, 542 N.E.2d 1048.

### IV.  *Bedford's Claim for Payment*

### A.  *Pollutants Discharged In The Regular Course of Business*

■ The pollution exclusion clause "... excludes from coverage liability based on all intentional discharge of waste materials regardless of whether the consequential damages were intended or unintended (ci-

tations omitted)." The exclusion concerns pollution that occurs in the regular course of business of the insured. *See Redding–Hunter Inc. v. Aetna Cas. and Surety Co.*, 206 A.D.2d 805, 615 N.Y.S.2d 133, 135 (3d Dept.1994) ("Courts have repeatedly concluded that waste discharges which are a concomitant of normal business are not 'sudden' within the meaning of the exclusion"); *Technicon Elecs. Corp. v. American Home Assur. Co.*, 141 A.D.2d 124, 133, 533 N.Y.S. 91, 96 (2d Dept.1988), *aff'd* 74 N.Y.2d 66, 544 N.Y.S.2d 531, 542 N.E.2d 1048 (1989); *Powers Chemco Inc. v. Fed. Ins. Co.*, 74 N.Y.2d 910, 911, 549 N.Y.S.2d 650, 651, 548 N.E.2d 1301 (1989) (discharges which occur over a long period of time and result from intentional, purposeful activity are neither sudden nor accidental within the means ascribed by New York courts).

### B.  *The Sudden and Accidental Exception*

■ The "sudden" and "accidental" exception to the exclusion from coverage clause is discussed in *Northville*, 89 N.Y.2d 621, 657 N.Y.S.2d 564, 679 N.E.2d 1044. In *Northville*, the insured was engaged in the bulk storage, distribution and sale of gasoline and other petroleum products. It had above-ground and below-ground storage tanks. There was a release of gasoline from the storage tanks into the groundwater.

The court held that once the insurer satisfies its burden of showing that the discharge involves polluting the environment and is thus excluded from coverage under the policy, the burden shifts to the insured to demonstrate that the pollution was the result of the "sudden and accidental" discharge and therefore within the exception to the exclusion rule. 89 N.Y.2d at 634, 657 N.Y.S.2d at 568, 679 N.E.2d 1044.

---

**5.** Sills appealed the judgment made and entered on August 6, 1997. Rosenman & Colin,

LLP (by Richard G. Leland) represented Sills in the appeal.

In defining the separate meaning the two terms have, the Court held:

[t]he term 'accidental' includes not only an unintended event but also one 'occurring unexpectedly or by chance' (Webster's 9th New Collegiate Dictionary). [Included] within the meaning of sudden in the pollution exclusion exception is temporal quality, as a discharge of the pollutant abruptly, precipitantly or brought about in a short time. Such a construction accords with the mandate of *Technicon Elec. Corp. v. American Home Assur. Co.* [74 N.Y.2d 66, 544 N.Y.S.2d 531, 542 N.E.2d 1048 (1989)] to give separate effect to the dual, sudden and accidental discharge requirements of the exception ...

89 N.Y.2d at 631, 657 N.Y.S.2d at 567, 679 N.E.2d 1044. The court further stated:

The focus in determining whether the temporally sudden discharge requirement is met, for the purpose of nullifying the pollution coverage exclusion, is on the initial release of the pollutant, not on the length of time the discharge remains undiscovered, nor the length of time that damage to the environment continued as a result of the discharge, nor on the timespan of the eventual dispersal of the discharged pollutant in the environment (citations omitted).

On the other hand, the sudden discharge element of the pollution exclusion exception cannot be established merely by showing that the release of the pollutant had its onset at some particular point in time, and, in that sense, the discharge could be said to have begun 'abruptly.' ... Rather, the temporal aspect of the sudden discharge element would only be met by the discharge, abruptly or within a short timespan, of a significant quantity of the pollutant sufficient to have some potentially damaging environmental effect. When such a discharge was unintended and unexpected, the sudden

and accidental exception in the pollution exclusion clause will have been satisfied. Coverage, however, would not necessarily be negated entirely if such a discharge continued undetected for some period of time, even though at some point continued release could no longer be deemed sudden or accidental for purposes of the duty to indemnify (citations omitted).

89 N.Y.2d at 633, 657 N.Y.S.2d at 568, 679 N.E.2d 1044.

To sustain its burden of establishing the exception to the exclusion coverage relating to pollutants, Bedford was required to show that the discharge was unexpected and unintended, *i.e.,* "accidental," and that the discharge was instantaneous and/or short-lasting, *i.e.,* "sudden."

Bedford has failed to sustain its burden. It is clear that the pollution continued over a long period of time and as a practice in accordance with the dry cleaning business.[6]

## ORDER

The claim for payment by Bedford against Home pursuant to F.R.Civ.P. 69(a) and N.Y. CPLR § 5227 is denied and the petition is dismissed.

Sills' claim for legal fees (in accordance with the agreement with Home regarding the hourly rate) is granted. Sills' attorney shall serve a statement of the legal services rendered by Rosenman & Colin, LLP and Jacobs Persinger & Parker. Home (by Jean–Pierre D. Van Lent) shall answer within ten (10) days of receipt of said statement.

SO ORDERED.

---

6. As to the issue of fraud in the failure of Sills to inform Home of the condition of the land prior to the effective date of the policy—May

8, 1980, we find that the policies are void because of Sills' knowing and intentional concealment.