**Allen QUESTROM, Plaintiff,**

v.

**FEDERATED DEPARTMENT STORES, INC.,
Defendant.**

**No. 98 Civ. 0659(LAK).**

United States District Court,
S.D. New York.

Feb. 25, 1999.

---

Richard L. Fenton, Andrea L. Zopp, Helen B. Kim, Sonnenschein Nath & Rosenthal, for plaintiff.

John M. Newman, Jr., Robert W. Gaffey, Mark Herrmann, Christopher Fisher, Jones, Day, Reavis & Pogue, for defendant.

### OPINION

KAPLAN, District Judge.

In 1990, Allen Questrom was hired as chief executive officer of Federated Department Stores, Inc. ("Federated") and given the task of leading the company out of bankruptcy. As a spur to his efforts, Questrom's employment contract provided that he would receive, *inter alia*, incentive compensation calculated as a fixed percentage of the increase in Federated's equity value from 1990 until 1995. The contract provided also that the necessary determinations of equity value were to be made by a third party chosen, subject to Questrom's reasonable objection, by Federated. Federated paid Questrom incentive compensation of $16 million, an amount it asserts was determined by the contractually specified method. Questrom here claims that the third party determination was flawed and that he was entitled to $63 million. He now seeks to recover the $47 million difference. Federated moves to dismiss the action or for other relief

### Facts

As this is a motion to dismiss the complaint, the Court assumes the truth of the well pleaded factual allegations of the complaint.

1. *Id.* ¶ 8.

2. *Id.*

3. *Id.*

4. The Employment Agreement, attached as Exhibit 2 to the complaint, properly is consid-

### Questrom's Relationship With Federation

Questrom originally joined Federated as a management trainee in 1965. Over the next twenty-three years, he climbed through the ranks to become, successively, executive vice-president of the Bullock's division, president of the Rich's division, chairman and chief executive officer of Rich's, chairman and chief executive officer of Bullock's and, in 1987, vice-chairman of Federated. He left the company in 1988 in the wake of a hostile takeover to become the chief executive officer of Neiman–Marcus Group, Inc.

### The Employment Agreement

Federated filed for Chapter 11 bankruptcy protection in January 1990.[1] Perceiving a need for "strong management" in order to restore creditor, consumer, vendor, and employee confidence, Federated sought out Questrom's services.[2] In February 1990, Federated signed Questrom to an employment contract (the "Employment Agreement") making him Federated's new chief executive officer for an initial tenure of five years.[3]

The terms of Questrom's compensation are set forth in Article II of the Employment Agreement.[4] Questrom was entitled to $2,000,000 upon commencement of his employment followed by annual payments of $800,000 on January 31 of each of the years 1991 through 1995.[5] The Agreement further provided that Questrom was to receive incentive compensation of 0.75 percent of any amount of "Equity Appreciation" up to $500 million, plus 1.5 percent of any Equity Appreciation in excess of $500 million up to $1 billion, plus 2 percent of any Equity Appreciation in excess of $1 billion.[6]

ered on this motion to dismiss. *See Kramer v. Time Warner, Inc.,* 937 F.2d 767, 773 (2d Cir.1991).

5. Employment Agreement ¶ 2.1E.

6. *Id.* ¶ 2.1B.

As might be expected of such sophisticated parties in a matter potentially involving so much money, the contract carefully defined the terms by which Questrom's incentive compensation, if any, would be computed and the process by which the critical economic determinations would be made.

*The Definitions*

"Equity Appreciation"—of which Questrom was to receive a share—was defined as "the amount by which the Equity Value of Federated/Allied on the Valuation Date [January 28, 1995] exceeds the Base Equity Value of Federated/Allied."[7] "Base Equity Value" in turn was defined as "the market value of the common equity of Federated/Allied on a consolidated basis as [of February 3, 1990.]"[8] The Agreement further provided that the "Equity Value of Federated/Allied on the Valuation Date" "shall be the market value of the common equity of Federated Allied on a consolidated basis as at that date, increased by the amount of any unusual or special dividends or other special or unusual distributions to shareholders after February 3, 1990, and prior to the Valuation Date."[9]

*The Process*

The Employment Agreement contained detailed provisions governing the manner in which the components of Equity Appreciation were to be determined and, in some respects, the factors to be considered in doing so.

In all events, the components of Equity Appreciation were to be determined by an outside third party. Section 2.1C provided that, both for determining the Base Equity Value and the Equity Value of Federated/Allied on the Valuation Date:

"the common equity value of Federated/Allied shall be determined by an investment banking or other qualified firm selected by the Board of Directors of Federated and Allied, provided that [Questrom] has no reasonable objection to such firm."[11]

In making those determinations, the investment banking or other firm was to "base its determination on market values of similar businesses (on a going concern basis), taking into account net income, cash flow, capital structure, and such other factors as such firm deems relevant in establishing such values."[12] In certain circumstances, however, a different approach to valuation was to be employed:

"Notwithstanding the foregoing, in the event that on [January 28, 1995] common shares of Federated and/or Allied are being traded publicly (with not less than 25% of the common shares of Federated or Allied, as the case may be, held by the public) and if the firm determining such value determines that such public trading price accurately reflects the market value of Federated or Allied as the case may be without minority discount, then the market value of Federated and/or Allied, as the case may be, shall be the average of the closing prices for the common shares of such company in the public market for the ninety (90) calendar days preceding [January 28, 1995] (or such shorter period during which common shares of such company have been traded publicly). If the firm determining such value does not determine that such public trading price accurately reflects the market value of Federated or Allied, as the case may be, without minority discount, then the market value as of [January 28, 1995] shall be determined as provided in Section 2.1C."[13]

The Employment Agreement thus called for two separate valuations of Federated

---

7.  *Id.* ¶ 2.1A; Cpt. ¶ 9.

8.  *Id.* ¶ 2.1C.

9.  *Id.*

11.  *Id.*

12.  *Id.*

13.  *Id.* ¶ 2.1D.

as predicates for the determination of whether Questrom was entitled to incentive compensation and, if so, the amount to which he was entitled—the first as of February 3, 1990 and the second as of January 28, 1995.

*The Morgan Determinations*

The values that ultimately would be placed on Federated for purposes of Questrom's Employment Agreement evidently were a matter of discussion within the company long before Questrom departed. Notable for present purposes is the fact that G. William Miller, then chairman of Federated's board, wrote a memorandum dated January 25, 1993 stating his expectation that "by January 1995 the two tests for using trading prices in determining equity value would have been met." [14] Questrom responded by rejecting Miller's assumptions. [15]

In time, Federated retained J.P. Morgan Securities, Inc. ("Morgan") to determine the company's Base Equity Value. In July 1993, it reported its determination that the Base Equity Value as of February 3, 1990 was $1,627,376,864 "plus additional equity investments made prior to the final Valuation Date." [16] The figure subsequently was adjusted to account for these investments, resulting in a figure of $2,800,805,-341. [17] As Questrom raised no objection to Morgan or its work in 1993, [18] and raises none here, the determination of Base Equity Value is not in controversy in this action. [19]

Federated again retained Morgan to perform the 1995 valuation, i.e., to determine the Equity Value of Federated/Allied on the Valuation Date. [20] Questrom initially did not object to this selection. [21] After Morgan completed its preliminary work, however, Questrom claims that

> "it became apparent .... that Morgan was failing to apply the normal and customary valuation procedures necessary to value a large, complex organization like Federated and that its preliminary conclusions varied substantially from any reasonable judgment regarding Federated's value as of January 28, 1995." [22]

As a result, Questrom requested and received materials forming the basis of Morgan's preliminary work. [23] These included the Miller memorandum, although not Questrom's 1993 response to it. [24] Questrom asserts that "it was apparent that Morgan, despite protestations to the contrary, was influenced by Miller's erroneous memorandum and otherwise had departed from industry standards." [25]

On September 11, 1995, Questrom wrote Robert A. Charpie, chairman of Federated's compensation committee, objecting in detail to the continued use of Morgan and requesting the selection of a new firm to complete the valuation task. [26] This request was denied and, on October 28, 1995, Morgan issued an opinion determining that the Equity Value of Federated/Allied on the Valuation Date, January 28, 1995, was $4 billion. [27] Federated paid Questrom the

14. *Id.* Ex. 3.

15. *Id.* Ex. 4.

16. Cpt. ¶ 10.

17. *Id.*

18. Questrom's disagreement with the Miller memorandum was not material to the Base Equity Value determination.

19. Cpt. ¶ 10.

20. *Id.* ¶ 12.

21. *Id.*

22. *Id.*

23. *Id.* ¶ 13.

24. *Id.*

25. *Id.*

26. *Id.* Ex. 5 ("Questrom Letter").

27. *Id.* ¶¶ 15, 17.

$16 million due under the contract in light of Morgan's determination.[28]

*Questrom's Attack on Morgan's 1995 Determination*

Questrom's complaint attacks the 1995 Morgan valuation. He claims that Morgan "failed to perform any analysis of the going concern market values of similar businesses" despite the fact that "Morgan and the Compensation Committee acknowledged that Federated's stock price was artificially depressed in January of 1995 because of Federated's December 1994 acquisition of Macy's and distribution of approximately 58,000,000 shares of Federated Stock to Macy's creditors."[29] He contends that it failed to adhere to the Employment Agreement or to industry standards, that it failed to account properly for the Macy's transaction, and that it improperly relied on the Miller memorandum.[30] He argues that the resulting Morgan valuation "comes close to replicating the admittedly inadequate per share price and fails to properly account for the long term benefits derived from the Macy's transaction."[31] Questrom notes that other valuations of Federated during this time period reached different conclusions than those reached by Morgan. In 1994, for example, relying on the advice of Smith Barney Inc., Federated used a six-year earnings projection that "would have led to a market value of Federated at January 28, 1995 ... well in excess of $5 billion."[32] In 1996, The Boston Consulting Group allegedly opined that Federated's value as of January 1995 was in excess of $6 billion.[33]

In the last analysis, Questrom claims that the Equity Value of Federated/Allied on the Valuation Date, contrary to Morgan's determination, was over $6 billion and that he was entitled to incentive compensation of $63 million.[34] He seeks damages in the amount of $47 million, the difference between that figure and the $16 million he already has been paid. He claims also that Federated is obliged by the Employment Agreement to reimburse him on a monthly basis for legal fees incurred in relation to this dispute.[35]

*Discussion*

Questrom contends that Morgan should have been disqualified or, alternatively, that its determination of the Equity Value of Federated on the Valuation Date was flawed. In consequence, he maintains that the Court now should proceed to determine the incentive compensation due him under the Employment Agreement and award judgment for any difference between that amount and the $16 million already paid.

Federated disputes Questrom's premises, contending that the record now before the Court demonstrates as a matter of law that Questrom's objection to the use of Morgan came too late and that his attacks on its work lack merit. If it is correct,

---

28. Cpt. ¶ 23.
   Accepting *arguendo* Morgan's determinations, as adjusted, the incentive compensation due to Questrom appears to have been $15,233,893. (The Equity Appreciation was $4 billion less $2,800,805,341, or $1,199,-194,659. Questrom was entitled to 0.75 percent of the first $500 million ($3.75 million), 1.5 percent of the next $500,000 ($7.5 million), and 2 percent of the $199,194,659 excess over $1 billion ($3,983,893).) The parties, however, agree that Questrom was paid $16 million and Federated at this point takes no issue with that amount.

29. *Id.* ¶¶ 16, 17.

30. *Id.* ¶ 21.

31. *Id.* ¶ 17.

32. *Id.* ¶ 19.

33. *Id.* ¶ 20. Seneca Financial Group, Inc., hired by Questrom personally, valued Federated at more than $6 billion as of January 28, 1995. *Id.* ¶ 22.

34. The $63 million figure implies an Equity Value of Federated on the Valuation Date of approximately $6.4 billion, or more than 150 percent of the amount determined by Morgan.

35. Cpt. ¶¶ 24–26.

Questrom's central claim must be dismissed. But Federated goes one step further. It maintains that even if Morgan's determination of the components of Equity Appreciation was infirm—either because Morgan should not have been permitted to go forward in the face of Questrom's objection or because Morgan failed to adhere to the Employment Agreement in making its determination—Questrom is entitled to no more than a redetermination in accordance with the Employment Agreement. It therefore maintains that Questrom's prayer for damages with respect to allegedly unpaid incentive compensation must be stricken even if that aspect of the complaint cannot be dismissed in its entirety. In essence, Federated argues that the parties contracted for a binding, non-judicial means of determining Questrom's incentive compensation and that their bargain should be enforced even if the first effort at making that determination failed. The motion therefore requires careful consideration of the role of third party determinations such as that contemplated here in the law of contracts. At the outset, however, Questrom's objection to the use of Morgan is disposed of readily.

### The Objection to the Selection of Morgan

Questrom concedes that he accepted the selection of Morgan.[36] After Morgan completed preliminary work, however, Questrom concluded that Morgan's preliminary results were inaccurate.[37] He then requested and received further information concerning Morgan's methodology.[38] Just over a month before Morgan issued its formal opinion, Questrom finally lodged an objection to the "continued use of J.P. Morgan." [39]

When Questrom acquiesced in Morgan's selection, he failed to exercise the narrow right granted him by the Employment Agreement. Questrom's only right to object to Morgan arose from the agreement's provision that valuation be done by a third party "selected by the Board of Directors of Federated or Allied, provided that [Questrom] has no objection to such firm." [40] This language was clear; Questrom was entitled to object to "such firm," not to the work it did. The same language communicated an implicit time line: Federated was to select a firm, and Questrom either would or would not make an objection. When Federated selected Morgan, and Questrom voiced no objection to that selection, his opportunity to influence the choice of investment banker ended.

### Contracts for Third Party Appraisals

Having resolved Questrom's contention that Morgan should not have served in 1995, the Court turns to the effect of its determination.

Contracts conditioning the duties of the contracting parties upon approvals of third parties long have been common in the commercial world. So too contracts transferring property or services at prices to be determined by others. Such procedures—which commonly are referred to as appraisals or, especially in older sources, appraisements—like their close relation, arbitration, have had a checkered history in the courts.

"Historically the courts have evidenced an attitude hostile to the growth of both appraisal and arbitration." [41] In the seminal case of *Milnes v. Gery*,[42] the English Chancery Court declined specific enforce-

---

**36.** Cpt. ¶ 12.

**37.** *Id.*

**38.** *Id.* ¶ 13.

**39.** *Id.* ¶ 14.

**40.** Employment Agreement ¶ 2.1C.

**41.** Note, *The Specific Performance of Appraisal Contracts—A Further Repudiation of* Milnes v. Gery, 33 VA.L.REV. 494, 495 (1947) (hereinafter *Virginia Note* ).

**42.** 14 Ves. 400, 407–09, 33 Eng.Rep. 574, 577–78 (Ch.1807).

ment of a contract for the sale of property at a price to be fixed by party-appointed appraisers where the appraisers were unable to agree on a valuation. It did so on the theory that agreement by the appraisers was a condition precedent to the parties' obligation. And although the Chancery Court did not so state, commentators have suggested another motivation for this narrow view, "[t]he unwillingness of the court to aid in holding parties to an agreement, the object of which is to exclude the determination of controversies by the judicial tribunals." [43]

*Milnes v. Gery* gave rise in many jurisdictions to the view that appraisal clauses in contracts will not be enforced specifically in the absence of a statute.[44] Moreover, the view that it manifested resulted in a similarly inhospitable attitude toward the conclusiveness of determinations made by appraisers in subsequent litigation between the contracting parties.

Given New York's long history as a commercial center, the development of its law in this area is illustrative, although of course it cannot be applied uncritically in other jurisdictions. Initially, there was no distinction between arbitration and appraisal as those terms now are used.[45] Reflecting the general judicial distaste for arbitration, the New York Court of Appeals adopted the rule of *Milnes*, holding that specific performance of a covenant of a lease of land at a price to be fixed by appraisal was not available in this state.[46]

In 1856, the House of Lords in *Scott v. Avery*[47] "suggested the possibility of ob-taining indirect enforcement of an 'arbitration' provision by making its performance a condition precedent to contractual liability," [48] upholding an insurance policy making appraisal of a claimed loss a condition precedent to an action on the contract. But while the rule of *Scott v. Avery* developed as a means of circumventing judicial hostility to "arbitration" by rendering at least certain types of appraisal agreements enforceable, it had an unintended consequence. As statutes making awards rendered in formal arbitration proceedings enforceable were adopted, "courts were forced to hold that" the informal awards of insurance appraisers "were not arbitrations" in order to give effect to their determinations.[49]

The mischief inherent in this distinction is illustrated by *Matter of Delmar Box Co.*[50] The case involved a loss under a fire insurance policy which provided that, absent agreement by the parties, the amount of the loss would be determined by the appraisal of three arbitrators, one appointed by each party and the third by agreement of the other two. When the insurer refused to appoint its appraiser, thus frustrating the insured's effort to obtain a determination of the amount of the loss, the insured petitioned under the arbitration statute for an order compelling the carrier to appoint its appraiser so that the matter could proceed. But the New York Court of Appeals affirmed dismissal of the petition on the ground that the appraisal contemplated by the insurance policy was not an agreement to arbitrate and therefore was not within the statute providing

---

**43.** Hayes, *Specific Performance of Contracts for Arbitration or Valuation,* 1 Cornell L.Q. 225 (1916).

**44.** *Virginia Note,* 33 Va.L.Rev. at 495.

**45.** *See, e.g.,* State of New York, Report of the Law Revision Commission for 1958, N.Y.Leg. Doc. No. 65, *Specific Enforcement of Agreement for Appraisal* 395, 398 (1958) (hereinafter Law Revision Commission Report); Wesley A. Sturges & William W. Sturges, *Appraisals of Loss and Damage Under Insurance Policies,* 11 Miami L.Q. 1, 5–6 (1956).

**46.** *Greason v. Keteltas,* 17 N.Y. 491, 496–97 (1858).

**47.** 5 H.L. 811, 10 Eng.Rep. 1121 (1856).

**48.** Law Revision Commission Report at 399.

**49.** Note, *Scope of the New York Arbitration Law,* 43 Harv.L.Rev. 809, 812 (1930).

**50.** 309 N.Y. 60, 127 N.E.2d 808 (1955).

for specific enforcement of such agreements.[51]

*Delmar Box Co.* led to statutory reform. In 1958, on recommendation of the Law Revision Commission, the Legislature enacted an amendment to the Civil Practice Act rendering agreements for valuation or appraisal specifically enforceable. Following a further study by the Advisory Committee on Practice and Procedure,[52] the Legislature adopted what is now Section 7601 of the Civil Practice Law and Rules, which provides for specific enforcement of appraisal agreements in accordance with Article 75 of the CPLR.[53] The Court of Appeals subsequently has held that the CPLR empowers courts to confirm an appraiser's determination,[54] which implies also that judicial review of such a determination is limited.[55]

The New York background thus points up the two central questions concerning appraisal provisions that are pertinent in this case: the effect to be given appraisers' determinations and the relief to be granted if the determination suffers some legal infirmity. With this general background, the Court turns to Questrom's complaint, the sufficiency of which is governed by Ohio law in light of the governing law clause of the contract.[50]

*The Effect of Morgan's Determination*

Questrom contends that Morgan's determination of the components of Equity Appreciation is not binding here for two reasons. He argues first that the parties did not intend Morgan's valuation to be final and binding; in consequence it is no more than some evidence of the Equity Appreciation. In any case, however, he contends that the alleged flaws in Morgan's 1995 work preclude reliance upon it.

*The Effect of the Appraiser's Determinations Under the Agreement*

The general position of an appraiser's determination under Ohio law is quite clear.

In *Fred R. Jones Co. v. Fath*,[51] an excavator's assignor entered into a contract with the City of Cleveland pursuant to which the city agreed to pay for excavation in accordance with the quantity of material excavated as determined by the city engineer. The excavator sued the assignor for additional compensation, but the Ohio Supreme Court rejected the claim. It noted that the excavator had agreed to accept the compensation due to the assignor under its contract with the city and stated broadly that "[w]here parties to a . . . contract agree to abide by the decision of [a third party arbiter] . . . the decision of the arbiter so designated is binding upon the parties, unless it is shown by clear and convincing evidence that such decision was based upon fraud, dishonesty or collusion."[52]

---

**51.** *Id.* at 63, 127 N.E.2d 808.

**52.** N.Y. ADV. COMM. ON PRAC. & PROC., FOURTH PRELIM. REP., Legis. Doc. No. 20, at 62–65 (1960).

**53.** N.Y. CPLR § 7601 (McKinney 1998).

**54.** *Penn Central Corp. v. Consol. Rail Corp.*, 56 N.Y.2d 120, 128–30, 451 N.Y.S.2d 62, 67–68, 436 N.E.2d 512 (1982).

**55.** *See* Vincent C. Alexander, *Practice Commentaries*, 7B McKINNEY'S CONSOLIDATED LAWS OF NEW YORK: CPLR 7001 TO 7700, at 933 (1998).
While there seems to be little New York case law as to the effect of an appraiser's determination in subsequent litigation, the terms of CPLR § 7601 and *Penn Central's* holding that courts may confirm such findings implies that they are binding on the parties unless one of the grounds specified in CPLR § 7511 is established.

**50.** Employment Agreement ¶ 3.6.

**51.** 101 Ohio St. 47, 126 N.E. 878 (1920).

**52.** *Id.* at 48, 126 N.E. 878.
Moreover, the court rejected the excavator's contention that the city engineer's determination was not conclusive because the engineer acted to protect the city from liability and that one party acted out of fear of a penalty. The court found these allegations insufficient to show the collusion, dishonesty or bad faith necessary to avoid the appraisal's result.

The Ohio court, in an opinion by Judge (later Justice) Stewart, reiterated this view in *Brennan v. Brennan*,[53] a case in which a contract of sale designated a third party to ascertain the book value of a company's stock for use in determining its purchase price. Referring to the appraiser as an arbitrator, the court ruled that "[i]t seems to be the universal law that where a matter is submitted by parties to an arbitrator for decision, with an agreement that the arbitrator's decision shall be binding upon the parties, they are bound by such decision provided there is no fraud or bad faith upon the part of the arbitrator and he acts according to the instructions given him."[54] And even more recently, the Ohio Court of Appeals has stated that "a court will indulge in every reasonable presumption to sustain [an appraisal] in the absence of fraud, mistake or misfeasance."[55]

Questrom nevertheless seeks to avoid Morgan's determination of Federated's equity value in 1995 by contending that contractually-required third party valuations are not binding upon the parties under Ohio law absent explicit language to that effect in the contract. He relies upon the fact that the contract before the court in the *Brennan* case so provided. But the Court is not persuaded that only such explicit language renders an appraisal binding upon the parties.

■ As the preceding discussion indicates, appraisals have been given binding effect in Ohio—absent fraud, mistake or collusion—both before and after *Brennan.*

Certainly the contract at issue in *Fred R. Jones Co.* contained no explicit provision such as Questrom claims is essential, yet the Ohio Supreme Court held that the parties were bound by the appraiser's decision. Faced with an explicit expression of intention to be bound, the *Brennan* court remarked on the obvious result in such a situation. It did not, however, create any requirement of such language. And subsequent Ohio decisions have been clear that parties are bound by appraisal determinations, even when the contracts requiring them lack such explicit language. In *Scott & Fetzer Co. v. Harper Bros., Inc.*,[56] for example, a contract designated appraisers to determine the value of a commercial property but did not specifically state that the appraisal would be final and binding.[57] Taking no note of the absence of such specific language, the court refused to scrutinize the judgment of the appraisers, rejecting any "attack on the appraiser's valuation standards, the evidence he found to be significant, or the weight he gave such evidence."[58] Instead, the court found that "appraisers selected by an agreed procedure are the sole judges of the applicable law and facts within the confines of the issues submitted."[59] And this approach was replicated in *Smith v. Shelby Insurance Group*,[60] where the court held that an appraisal of an insurance loss was binding on the parties, absent fraud or mistake, despite the lack of any provision in the policy making the appraisal conclusive on the parties.[61]

---

**53.** 164 Ohio St. 29, 128 N.E.2d 89 (1955).

**54.** *Id.* at 37, 128 N.E.2d at 94.

**55.** *Smith v. Shelby Ins. Group,* Nos. 96–T–5547, 96–T–5566, 1997 WL 799512, at *4 (Ohio App. Dec. 26, 1997), *appeal dismissed,* 82 Ohio St.3d 1410, 694 N.E.2d 74 (1998). *Accord,* 6 WALTER H.E. JAEGER, WILLISTON ON CONTRACTS § 802 (3d ed.1961).

**56.** No. 46832, 1983 WL 2812 (Ohio App. Nov. 23, 1983).

**57.** *See id.* at *1.

**58.** *Id.* at *4.

**59.** *Id.*

**60.** 1997 WL 799512.

**61.** To similar effect is *Lakewood Manufacturing v. Home Ins. Co. of New York,* 24 Ohio Misc. 244, 422 F.2d 796, 798 (6th Cir.), *cert. den.* 400 U.S. 827, 91 S.Ct. 53, 27 L.Ed.2d 56 (1970). In that case, the Sixth Circuit considered the deference due an appraisal conducted pursuant to an insurance policy. Again, the policy did not explicitly state that the parties would be bound by the results of the appraisal, but the court declared nonetheless that the appraiser's decision would be set

In the final analysis, the critical question on this aspect of the motion is whether the Employment Agreement unequivocally reveals the parties' intention to be bound by the investment banker's valuation. On that score there is little room for doubt.

■ The language and structure of the third party valuation provision in the Employment Agreement is unambiguous. The provision is in the form of a definition absolute in tone: both the Base Equity Value and the Equity Value on the Valuation Date are defined as amounts that are "determined by an investment banking or other qualified firm." [62] In other words, the amount of incentive compensation due Questrom under the contract was defined to be the difference between two figures, each of which was to be "determined" by the investment banker. Moreover, the provision was structured carefully to place the complex determination in the hands of a mutually acceptable and presumably expert third party. The discretion of that third party then was channeled by various requirements concerning the methodology.[63]

These precautions all would be rendered superfluous by a conclusion that the parties sought the third party valuation merely to inform a subsequent judicial determination. It is beyond credit to suggest that these highly sophisticated parties, addressing an element of Questrom's compensation entitling him to a payment potentially in the eight-figure range, deliberately would leave open to question, not to men-

tion litigation, the fundamental measure of that payment. The provision unambiguously bespeaks an attempt to avoid litigation of this very sort. The Court therefore holds that the parties' intention was that the valuation was to be conclusive on the parties to the maximum extent permitted by Ohio law—in other words, they agreed that it would be binding absent fraud, mistake, or collusion.

*Morgan's Alleged Errors*

The Court next turns to Questrom's attack on its methodology. Distilling the complaint, it appears that Questrom's assigns four errors.

■ Questrom first claims that Morgan failed to apply normal and customary valuation techniques.[64] But the contract did no more than require that the determination be based upon market values of similar businesses, "taking into account net income, cash flow, capital structure, and such other factors as such firm deems relevant in establishing such values." [65] The contract did not otherwise require use of any particular valuation technique. Questrom's first contention thus amounts to nothing more than disagreement with Morgan's business judgment and therefore is insufficient to sustain the breach of contract claim.[66]

■ Next, Questrom alleges that Morgan's analysis improperly relied upon the Miller letter, which had recommended use of the market price of Federated's shares.[67] The agreement, however, gave

---

aside only upon a showing of fraud or manifest mistake. *Id.* at 798. *See also Csuhran v. Merrimack Mutual Fire Insurance Co.,* No. 93–L–143, 1994 WL 102248, at *1, 2 (Ohio App. Mar. 18, 1994) (language stating that appraiser's decision "will set the amount of loss" sufficed to warrant substantial deference).

Questrom's reliance on *Weinberg–Marcus Cardiomedical Group, Inc. v. Joffe,* No. 9582, 1986 WL 6329 (Ohio App. June 2, 1986), is misplaced. While the court there noted the absence of language making the third party's determination binding on the parties, the case was decided on a different ground and, in any case, did not purport to

suggest that an appraisal may be conclusive on the parties *only* if such language is used.

62. Employment Agreement ¶ 2.1C.

63. *Id.* ¶¶ 2.1C, 2.1D.

64. Cpt. ¶ 12.

65. Employment Agreement ¶ 2.1C.

66. *See Scott & Fetzer,* 1983 WL 2812, at *4 (court may not question appraiser's methodology or business judgment).

67. *Id.* ¶ 13.

Morgan broad discretion in making its determination. The firm appropriately could receive information informing that choice.[68] Indeed, one of the hallmarks of appraisal proceedings is their informality, including the lack of any requirement of formal hearings or the taking of evidence.[69] Questrom's complaint that Morgan considered Miller's memorandum therefore at bottom is no more than a complaint about Morgan's exercise of business judgment. Like his allegation about valuation techniques, this is an insufficient basis for his claim.

Questrom's third point of alleged error is that Morgan failed "to properly account for the long term benefits derived from the Macy's transaction."[70] This, too, amounts to nothing more than a dispute over business judgment, and thus is not cognizable.

Finally, Questrom asserts that "Morgan failed to perform any analysis of the going concern market values of similar businesses as required by the Employment Agreement."[71] This is a more substantial objection.

As indicated above, the Employment Agreement provided that the third party appraiser:

"shall ... base its determination on market values of similar businesses (on a going concern basis), taking into account net income, cash flow, capital structure, and such other factors as such firm deems relevant in establishing such values."[72]

This provision thus cabined Morgan's discretion by requiring that it at least consider these matters, although it of course did not dictate the result to be reached after such consideration. As the Court is obliged to accept the truth of the well-pleaded factual allegations of the complaint at this stage of the litigation, it is bound to assume that Morgan did not base its determination on the values of comparable companies. It remains, however, to consider the consequence of this conclusion, a question inextricably linked to Federated's motion to strike Questrom's prayer for damages.

### The Permissible Relief and the Motion to Strike

Implicit in Questrom's complaint is the assertion that he is entitled to pursue an action for damages for alleged breach of the contract to pay him incentive compensation, at least if he succeeds in showing that Morgan failed to comply with the Employment Agreement in making its 1995 determination. Federated, *per contra*, moves to strike Questrom's damage claims on the theory that he is entitled to no more than what he bargained for—a third party determination of the Equity Appreciation in accordance with the Employment Agreement.

Were this an arbitration subject to the Federal Arbitration Act ("FAA"),[73] the result would be clear. The FAA preempts state law in many respects with respect to arbitrations subject to its terms.[74] Assuming that to be true with respect to this matter, the Court would confirm, vacate or modify the appraiser's decision and, if Morgan's determination of the amount of incentive compensation was not conclusive, it would stay Questrom's incentive compensation claim pending its redetermination by Morgan. But the FAA does not

68. Employment Agreement ¶ 2.1D.

69. *See, e.g., Guider v. LCI Comm. Holdings Co.*, 87 Ohio App.3d 412, 418–19, 622 N.E.2d 415, 420 (1993).

70. Cpt. ¶ 17.

71. *Id.*

72. Employment Agreement ¶ 2.1C.

73. 9 U.S.C. § 1 *et seq.*

74. *See Perry v. Thomas*, 482 U.S. 483, 490, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987); *Southland Corp. v. Keating*, 465 U.S. 1, 10, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984); *but see Volt Info. Sciences, Inc. v. Bd. of Trustees of the Leland Stanford Junior Univ.*, 489 U.S. 468, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989).

govern here for the quite simple reason that this appraisal is not an "arbitration" within the meaning of the federal Act.[75] In consequence, resort must be had to state law. As this is a diversity case, the Court is obliged to apply New York conflict of laws rules in determining the law governing the consequences of a conclusion that Morgan's determination was flawed.[76]

As the foregoing discussion assumes, New York doubtless would give effect to the parties' contractual choice of Ohio law as governing matters bearing on the validity of the appraisal agreement and the rights created thereby.[77] But the Conflicts Restatement draws a distinction between the validity and effect of agreements for non-judicial resolution of disputes, on the one hand, and questions going to the method of enforcing such agreements, on the other. In provisions dealing with the conflicts of laws principles affecting the validity, effect, and enforcement of arbitration agreements, it takes the view that validity and effect are determined, insofar as is relevant here, by the contractual governing law clause while means of enforcement are governed by the law of the forum, here New York.[78] Illustration 2 to Section 219, moreover, is directly pertinent here:

"A sues B for breach of contract in state X. B pleads in bar an arbitration agreement executed in state Y and containing a provision that it be governed by Y local law. Further, B asks that the court appoint arbitrators so that arbitration can proceed in X. Under the local law of Y a court is empowered to appoint arbitrators; the local law of X contains no such statutory authorization. In Y, agreements to arbitrate are irrevocable, while X follows the common law rule [of revocability]. The court will refuse to entertain the action. It will, however, decline to appoint arbitrators, since this question goes to the method of enforcing arbitration agreements and therefore depends upon the local law of the forum."

■ New York courts frequently follow the Conflicts Restatement in choice of law matters.[79] Although Section 219 pertains to arbitrations, the common heritage and substantially common purposes of appraisals and arbitrations, as well as New York's parallel schemes of enforcement methods,[80] lead to the conclusion that the principle there articulated is equally applicable to both. Moreover, New York takes the view that the law of the forum controls as to remedies.[81] Accordingly, although the parties have cited, and the Court has found, no controlling New York authority, the Court is persuaded that New York would apply New York law to determine the methods that would be employed to enforce the appraisal provision in the Employment Agreement.[82]

75. *Hartford Lloyd's Ins. Co. v. Teachworth*, 898 F.2d 1058, 1061–63 (5th Cir.1990).

76. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Sheldon v. PHH Corp.*, 135 F.3d 848, 852 (2d Cir.1998).

77. *See Smith Barney, Harris Upham & Co. v. Luckie*, 85 N.Y.2d 193, 201, 623 N.Y.S.2d 800. 804, 647 N.E.2d 1308 (1995); RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 218 (1971) (hereinafter RESTATEMENT).

78. RESTATEMENT §§ 218–19.

79. *See, e.g., Schultz v. Boy Scouts of Am., Inc.*, 65 N.Y.2d 189, 198, 491 N.Y.S.2d 90, 95–96, 480 N.E.2d 679 (1985); *Babcock v. Jackson*, 12 N.Y.2d 473, 482, 240 N.Y.S.2d 743, 749–50, 191 N.E.2d 279 (1963).

80. N.Y. CPLR § 7601 (McKinney 1998) (providing for judicial enforcement of an appraisal agreement "as if it were an arbitration agreement").

81. *E.g., Gantt v. Felipe Y. Carlos Hurtado & CIA*, 297 N.Y. 433, 438, 79 N.E.2d 815 (1948) (applying principle in arbitration context).

82. Interestingly, an Ohio appellate court, consistent with Section 219 of the Restatement, has held that Ohio conflicts principles required application of Ohio law in determining methods of enforcement of an appraisal agreement which contained a New York governing law clause. *Guider*, 87 Ohio App.3d at 417, 622 N.E.2d at 418–19.

Section 7601 of the New York Civil Practice Law and Rules provides in substance that appraisal agreements are to be enforced by the same methods as arbitration agreements. An arbitrator's award is subject to confirmation, modification or vacatur.[83] If Questrom's challenge to Morgan's determination is rejected, the determination will be confirmed and will resolve conclusively the only issue raised by Questrom's incentive compensation claim.[84] The same result will follow if the determination is modified. And if Questrom's challenge succeeds, the Court may exercise its authority to compel the parties to proceed to arbitration and to stay the incentive compensation claim pending the outcome.[85] In no event will Questrom's incentive compensation claim proceed to a judicial determination.

Although Ohio has no statute comparable to Section 7601 of the CPLR,[86] Ohio courts nevertheless have confirmed appraisal determinations and stayed court proceedings pending appraisal.[87] This Court therefore would reach the same result even if Ohio law governed the issue., which brings the Court to Federated's alternative motion to strike portions of Questrom's prayer for relief.

Questrom's prayer for relief in relevant part demands:

"(1) a determination by this Court that Questrom was entitled to incentive compensation of approximately $63,000,000 based on the valuation of Federated as determined by the Seneca Financial Group, Inc.;

(2) an award of damages in the amount of approximately $47,000,000, *i.e.*, $63,000,000 incentive compensation less the $16,000,000 already received by Questrom;

(3) prejudgment interest." [88]

Federated contends that none of this relief may be granted, substantially for the reasons outlined above, and that these prayers should be stricken.

Rule 12(f) of the Federal Rules of Civil Procedure authorizes district courts to strike "from any pleading ... any ... immaterial ... matter." As it is clear that Questrom, in light of the appraisal provision of the Employment Agreement, may not obtain a judicial determination of whether and to what extent he is owed incentive compensation except by means of confirmation of an appraiser's determination pursuant to the contract, paragraphs (1), (2) and (3) of his demand are immaterial and are stricken.

*Attorneys' Fee Claim*

Although Federated in form has moved to dismiss the entire complaint, neither party has addressed so much of Questrom's complaint as seeks to recover attorney's fees pursuant to the Employment Agreement. That claim is not within the scope of the appraisal provision of the contract. If there is a basis for its dismissal, it has not been brought to the Court's attention.

*Conclusion*

Federated's motion to dismiss the complaint or, in the alternative, to strike por-

83. N.Y. CPLR §§ 7509–11 (McKinney 1998).

84. *See Penn Central Corp.*, 56 N.Y.2d at 128–30, 451 N.Y.S.2d at 67–68, 436 N.E.2d 512.

85. *See id.* § 7503.

86. The Ohio arbitration statute does not apply to appraisal agreements. *Guider*, 87 Ohio App.3d at 419, 622 N.E.2d at 420; *Rademaker v. Atlas Assur. Co.*, 98 Ohio App. 15, 24, 120 N.E.2d 592, 596 (1954).

87. *See, e.g., Smith v. Shelby Ins. Group*, 1997 WL 799512, at *5 (affirming order confirming appraisal determination); *Guider*, 87 Ohio App.3d at 416, 622 N.E.2d at 418 (holding stay of litigation pending appraisal not appealable); *see also Saba v. Homeland Ins. Co. of Am.*, 159 Ohio St. 237, 112 N.E.2d 1 (1953) (affirming order appointing appraiser where party failed to do so and thus specifically enforcing appraisal agreement).

88. Cpt. at 9.

tions of the prayer for relief is granted to the extent that paragraphs (1), (2) and (3) of the prayer are stricken and denied in all other respects.

The Court will conduct a status conference on March 8, 1999 at 12:00 p.m.

SO ORDERED.