**Allen QUESTROM, Plaintiff,**

v.

**FEDERATED DEPARTMENT STORES, INC.,**
**Defendant.**

**No. 98 Civ. 0659(LAK).**

United States District Court,
S.D. New York.

Feb. 4, 2000.

Richard L. Fenton, Andrea L. Zopp, Helen B. Kim, Sonnenschein Nath & Rosenthal, for plaintiff.

John M. Newman, Jr., Mark Herrmann, Christopher P. Fisher, Jones, Day, Reavis & Pogue, for defendant.

## MEMORANDUM OPINION

KAPLAN, District Judge.

This is an action by Allen Questrom, former chief executive officer of Federated Department Stores, Inc. ("Federated"), to recover incentive compensation allegedly due him under his employment contract.

Briefly stated, the contract gave Questrom the right to a percentage of the increase in the appreciation in the equity value of the company, as determined by an investment banking firm chosen by Federated, over a defined period. The $16 million so determined has been paid to Questrom, who nevertheless contends that the investment banker's determination of the value as of the ending date was unduly low and that he is owed an additional $47 million.

In a prior opinion, familiarity with which is assumed, this Court rejected Questrom's damage claim, holding that the most to which he would be entitled in the event the investment banker did not act appropriately would be a redetermination under the contract.[1] It held also that the investment banker's determination is binding on the parties absent fraud, mistake or collusion, provided only that it acted within the scope of the discretion conferred upon it by the parties' agreement.[2] The decision left only one significant issue open for determination—whether, as Questrom alleges, the banker "failed to perform any analysis of the going concern market values of similar businesses as required by the Employment Agreement" in reaching its conclusion.

---

1. *Questrom v. Federated Dept. Stores, Inc.*, 41 F.Supp.2d 294, 305–07 (S.D.N.Y.1999).

2. *Id.* at 304–05.

The matter now is before the Court on Federated's motion for summary judgment dismissing the complaint.

I

A. *The Employment Agreement*

The terms of Questrom's compensation are set forth in Article II of the Employment Agreement.[3] Questrom was entitled to $2,000,000 upon commencement of his employment followed by annual payments of $800,000 on January 31 of each of the years 1991 through 1995.[4] The Agreement further provided that Questrom was to receive incentive compensation of 0.75 percent of any amount of "Equity Appreciation" up to $500 million, plus 1.5 percent of any Equity Appreciation in excess of $500 million up to $1 billion, plus 2 percent of any Equity Appreciation in excess of $1 billion.[5]

The contract carefully defined the terms by which Questrom's incentive compensation, if any, would be computed and the process by which the critical economic determinations would be made.

1. *The Definitions*

"Equity Appreciation"—of which Questrom was to receive a share—was defined as "the amount by which the Equity Value of Federated/Allied on the Valuation Date [January 28, 1995] exceeds the Base Equity Value of Federated/Allied."[6] "Base Equity Value" in turn was defined as "the market value of the common equity of Federated/Allied on a consolidated basis as [of February 3, 1990.]"[7] The Agreement further provided that the "Equity Value of Federated/Allied on the Valuation Date" "shall be the market value of the common equity of Federated Allied on a consolidat-

ed basis as of that date, increased by the amount of any unusual or special dividends or other special or unusual distributions to shareholders after February 3, 1990, and prior to the Valuation Date."[8]

2. *The Process*

The Employment Agreement contained detailed provisions governing the manner in which the components of Equity Appreciation were to be determined and, in some respects, the factors to be considered in doing so.

In all events, the components of Equity Appreciation were to be determined by an outside party. Section 2.1C provided that, for determining both the Base Equity Value and the Equity Value of Federated/Allied on the Valuation Date:

"the common equity value of Federated/Allied shall be determined by an investment banking or other qualified firm selected by the Board of Directors of Federated and Allied, provided that [Questrom] has no reasonable objection to such firm."[9]

In making those determinations, the investment banking or other firm was to "base its determination on market values of similar businesses (on a going concern basis), taking into account net income, cash flow, capital structure, and such other factors as such firm deems relevant in establishing such values."[10] In certain circumstances, however, a different approach to valuation was to be employed:

"Notwithstanding the foregoing, in the event that on [January 28, 1995] common shares of Federated and/or Allied are being traded publicly (with not less than 25% of the common shares of Federated or Allied, as the case may be, held by the public) and if the firm deter-

---

3. Cpt.Ex. 2.

4. Employment Agreement ¶ 2.1E.

5. *Id.* ¶ 2.1B.

6. *Id.* ¶ 2.1A; Cpt. ¶ 9.

7. *Id.* ¶ 2.1C.

8. *Id.*

9. *Id.*

10. *Id.*

mining such value determines that such public trading price accurately reflects the market value of Federated or Allied as the case may be without minority discount, then the market value of Federated and/or Allied, as the case may be, shall be the average of the closing prices for the common shares of such company in the public market for the ninety (90) calendar days preceding [January 28, 1995] (or such shorter period during which common shares of such company have been traded publicly). If the firm determining such value does not determine that such public trading price accurately reflects the market value of Federated or Allied, as the case may be, without minority discount, then the market value as of [January 28, 1995] shall be determined as provided in Section 2.1C." [11]

The Employment Agreement thus called for two separate valuations of Federated as predicates for the determination of whether Questrom was entitled to incentive compensation and, if so, the amount to which he was entitled—the first as of February 3, 1990 and the second as of January 28, 1995.

## B. The Initial Morgan Determination

Federated retained J.P. Morgan Securities, Inc. ("Morgan") to determine the company's Base Equity Value. In July 1993, it reported its determination that the Base Equity Value as of February 3, 1990 was $1,627,376,864 "plus additional equity investments made prior to the final Valuation Date." [12] The figure subsequently was adjusted to account for these investments, resulting in a figure of $2,800,805,341.[13] As Questrom raised no objection to Mor-

gan or its work in 1993, and raises none here, the determination of Base Equity Value is not in controversy in this action.[14]

## C. The 1995 Morgan Determination

Federated again retained Morgan to perform the 1995 valuation, i.e., to determine the Equity Value of Federated/Allied on the Valuation Date.[15] Morgan's team was led by Raymond N. Wareham, then co-head of its mergers and acquisitions department, and three subordinates, one of whom was a specialist in retailing and two of whom had worked on the earlier valuation of Federated for purposes of Questrom's Employment Agreement.

Morgan rendered its report under date of October 23, 1995. It first concluded that the public trading price of Federated stock "did not accurately reflect the market value of the Company without minority discount as of the Valuation Date," [16] thus requiring that the Final Equity Value be based "on market values of similar businesses (on a going concern basis), taking into account net income, cash flow, capital structure, and such other factors as such firm deems relevant in establishing such values." This determination, it might be noted parenthetically, was extremely favorable to Questrom because Federated's stock price was much lower than the value ultimately fixed by Morgan.[17] It then reported that:

> "Morgan employed established valuation methods in connection with this letter, including without limitation, an analysis of discounted cash flows ('DCF analysis'), an examination of the trading values of companies comparable to the Company ('Comparable Companies

11. *Id.* ¶ 2.1D.

12. Cpt. ¶ 10.

13. *Id.*

14. Cpt. ¶ 10.

15. *Id.* ¶ 12.
   Questrom belatedly objected to Morgan's selection to perform the 1995 valuation. The

Court, however, already has rejected that challenge. 41 F.Supp.2d at 300.

16. Wareham Decl.Ex. D, at 2.

17. *Compare id.* Ex. E, at JPM044, *with id.* Ex. E, at JPM0541; *see also* Wareham Dep. at 221.

Analysis'), and a review of the current and historical reported trading prices of the Company's common stock.

"Our DCF analysis was principally based upon three-year financial forecasts provided by the Company in the Company's 1995–1997 Business Plan and Capital Budget (the 'Financial Forecasts'). We performed sensitivity analyses to determine the impact on the Equity Value of (i) using different weighted average cost of capital rates to discount the projected free cash flows; (ii) using different growth rate assumptions for future free cash flows after the last year of the Financial Forecasts; and (iii) using sales growth assumptions for years four and five which were consistent with additional forecasts prepared by management which pre-dated the Financial Forecasts. For each case, we reviewed the ranges of values produced by these factors in the context of the other valuation methods used.

"For the Comparable Companies Analysis, we selected certain publicly-traded department store retailers (the 'Peer Group') whose market positions and growth expectations are, in our judgment, most closely comparable to those of the Company. Using the market price of common shares of the Peer Group as of the Valuation Date and other information reported by IBES as of the Valuation Date, we calculated for each company in the Peer Group a set of trading multiples (the 'Peer Group Multiples') based upon each company's projected earnings (with and without the amortization of goodwill) for the periods ending January 31, 1996 and January 31, 1997, and each company's estimated future long-term earnings growth rate. The Peer Group Multiples were then applied to such projected earnings for the Company for the fiscal years ending

January 31, 1996 and January 31, 1997 reflected in the Financial Forecasts, and to such estimated long-term growth rate of the Company, in order to determine a range of comparable Equity Values for the Company.

"We also reviewed data on the average daily trading prices and volume of the Company's · common stock separately and relative to the Standard & Poor's Department Store Composite Index. We used the data to review the relative volatility and price performance of the Company's common stock in absolute as well as relative terms."

"The results of these three valuation methodologies were evaluated separately and together in deriving fair value ranges for the common equity of the Company on a 'going concern' basis. Such fair value ranges do not, and are not intended to, reflect any control or other premium that a person might assign to acquiring a controlling interest in the company." [18]

Based on this analysis, Morgan opined that $21.875 per share, or "$4,035,112,047[,] is within a range of fair values for the Equity Value of the Company as of the Valuation Date." [19]

Morgan presented this opinion to Federated's Compensation Committee in October 1995. The slides for the presentation, consistent with the opinion letter quoted above, reflect the fact that Morgan employed DCF and comparable companies (there referred to as "public trading multiples") analyses in reaching its conclusions.[20] Moreover, in view of one of Questrom's arguments, discussed below, it is worth noting that the valuation range derived from the DCF analysis was $20.22 to $22.52 per share, which was higher than the range obtained through the comparable companies analysis, $18.82 to $22.24 per share.[21]

---

**18.** *Id.* at 2–3.

**19.** *Id.* at 4; Wareham Decl.Ex. E, at JPM056.

**20.** Wareham Decl. ¶ 8 & Ex. E, at JM045, JPM048–51.

**21.** The $20.22 to $22.52 per share translates to a range of $3,729.8 million to $4,154.1

Based on the Morgan figure of $4,035,-112,047 and the previously determined Base Equity Value, Federated paid Questrom $16 million in incentive compensation pursuant to the Employment Agreement.

## II

■ The principal focus of Questrom's attack on Morgan's 1995 valuation is the contention that it did not conform to the Employment Agreement in two principal and a number of subsidiary respects. He contends first that Morgan was not permitted to rely on a DCF analysis at all and, in any case, that its DCF analysis was flawed. Second, now conceding—contrary to his allegations—that Morgan in fact did a comparable companies analysis, he contends that it did not do so properly.

We begin with the scope of this Court's review of Morgan's actions. As demonstrated in the prior opinion, the decision of a third party appraiser such as Morgan is binding under the governing Ohio law absent fraud, mistake or collusion.[22] Questrom therefore will not here be heard to question its business judgment.[23] And while Morgan was obliged to act within the scope of the Employment Agreement,[24] it had considerable discretion in construing that document. Indeed, as Questrom explicitly concedes, he raised no objection to Morgan's selection based on the "condition … that it rely solely on its own interpretation of the Employment Agreement."[25]

### A. The DCF Analysis

Measured against this (or any other) standard, the first of Questrom's attacks is patently frivolous. A number of methods are used in valuing public companies, perhaps most notably DCF (which one court has said "is considered by experts to be the preeminent valuation methodology,"[26]), comparable company, comparable acquisition, and trading values.[27] Often, the valuer will perform several of these analyses to establish ranges of values for each model and then come to a judgment resting upon all of the data at hand. And that is exactly what Morgan did here—it determined a range of value based on a comparable companies analysis. It looked also at DCF and such other analyses as it thought relevant. It then exercised its judgment, in light of all the information before it, in selecting a point within the range established by the comparable companies analysis at which to fix the value.

This was entirely permissible under the Employment Agreement, even disregarding Questrom's concession that Morgan was entitled to interpret that Agreement for itself. The Employment Agreement specifically provided that Morgan was to base its valuation upon "market values of similar businesses (on a going concern basis), taking into account net income, cash flow, capital structure, and such other factors as such firm deems relevant in establishing such values." As a matter of plain English, to base a valuation on "market

million for the entire company. Harris Aff., June 21, 1999, Ex. 2, Ex. G, at JPM056. The range of $18.82 to $22.24 is equivalent to $3,471.6 million to $4,102.4 million. *Id.*

22. *Questrom*, 41 F.Supp.2d at 304.

23. *Id.* at 304 & n. 66 (citing *Scott & Fetzer Co. v. Harper Bros., Inc.*, No. 46832, 1983 WL 2812, *4 (Ohio App. Nov. 23, 1983)).

24. *Id.* at 305.

25. Cpt. ¶ 12.

26. *Neal v. Alabama By–Products Corp.*, C.A. No. 8282, 1990 WL 109243, *7 (Ch. Aug. 1,

1990), *aff'd*, 588 A.2d 255 (Del.Sup.1991). *See also Steiner Corp. v. Benninghoff*, 5 F.Supp.2d 1117, 1129 (D.Nev.1998) (DCF is "in theory the single best technique to estimate the value of an economic asset") (quoting *Cede & Co. v. Technicolor, Inc.*, Civ.A. No. 7129, 1990 WL 161084, *7 (Del.Ch.1990), *aff'd in part, rev'd in part on other grounds*, 634 A.2d 345 (Del.1993)).

27. *See generally* Jay W. Eisenhofer & John L. Reed, *Valuation Litigation*, 22 Del.J.Corp.L. 37, 112–26 (1997); Samuel C. Thompson, Jr., *A Lawyer's Guide to Modern Valuation Techniques in Mergers and Acquisitions*, 21 J.Corp.L. 457, 476–81, 530–38 (1996).

values of similar businesses" means only to form an opinion as to value that depends upon such values. Morgan did precisely that.

Questrom raises also a series of objections to the manner in which Morgan conducted the DCF analysis. Even putting aside the inconsistency between Questrom's contention that DCF analysis should not have been used at all and his insistence that the valuation should be set aside because it was performed improperly, these contentions all are academic. The range of values yielded by the DCF analysis was higher than that produced by the comparable companies analysis. Morgan fixed the Equity Value of the Company as of the Valuation Date near the top of the range of values determined by the comparable companies analysis. If the DCF analysis had any effect at all on the valuation, it therefore resulted in Questrom receiving more than he otherwise would have received. Hence, the correctness of Morgan's DCF analysis is immaterial here. In any case, however, Questrom's quibbles with the DCF analysis, in the context of this proceeding, would be unavailing.

To begin with, all save perhaps one of Questrom's quarrels with the DCF methodology are precisely the sort of disagreements with the manner in which Morgan carried out its assignment that, even if well founded, cannot be upset because they do not remotely approach fraud, mistake or collusion. And Questrom's only arguable point is factually erroneous.

The sole objection to Morgan's DCF analysis that arguably comes under the heading of mistake is Questrom's contention that Morgan failed to account for more than $900 million in net operating loss carryforwards ("NOL's"), which would have been usable to reduce Federated's future tax liability. But the undisputed evidence of record proves that Morgan did no such thing.

Briefly stated, DCF analysis seeks to value a company or revenue producing asset by estimating cash flows for each future year, estimating the terminal value— the amount to be realized upon future disposition of the asset, discounting the future cash flows and terminal value to present values using an appropriate discount rate, and adding the present values of the future cash flows and the terminal value.[28] As Questrom here questions only whether the NOL's were properly taken into account, the substance of his objection is that Morgan understated Federated's projected net cash flow in doing the DCF analysis and thereby undervalued the company at the Valuation Date.

Morgan avowedly based its DCF analysis on Federated's 1995–1997 Business Plan.[29] The Business Plan demonstrates on its face that the NOL's were taken into account, as it shows a book tax provision of $227.4 million for 1995,[30] but actual tax payments for that year of only $112 million,[31] thus demonstrating that anticipated taxes were reduced by the NOL's.[32] Indeed, Questrom and his expert ultimately conceded that the Business Plan properly took the NOL's into account.[33] It projected net cash flow for the relevant years as

**28.** *See generally Steiner Corp. v. Benninghoff,* 5 F.Supp.2d at 1130–38: Thompson, 21 J.Corp.L. at 476–81; Eisenhofer & Reed, 22 Del.J.Corp.L. at 112.

**29.** Wareham Dep. at 130.

**30.** Questrom Ex. D, at 6.

**31.** *Id.* at 12.
It should be noted that the effect of the NOL's would be felt over a period of years. The entire $900 million could not be used in a single year.

**32.** *Accord,* Storer Decl.

**33.** Harris Aff., July 16, 1999, report (hereinafter "Harris Surreply") at 1 ("Federated's Memorandum ... correctly states that Federated's 1995–97 Business Plan ... took into account Federated's NOL's.").

follows:[34]

| | 1995 | 1996 | 1997 |
|---|---|---|---|
| Net cash flow (millions) | ($44) | $0 | $7 |

The head of the Morgan team that handled this engagement testified that Morgan took the NOL's into account in performing its analysis although he was unclear as to the details of how they were treated in the model.[35] Its work papers, contrary to the speculation of Questrom's expert, confirms that it did. The very documents upon which Questrom relies in claiming that Morgan disregarded the NOL's and thus underestimated Federated's projected cash flow show that the projected cash flows that went into the Morgan DCF analysis were substantially identical to those in the concededly correct business plan:[36]

| | 1995 | 1996 | 1997 |
|---|---|---|---|
| Net cash flow (millions) | ($41.9) | ($0.2) | $6.7 |

Certainly Morgan could not have disregarded tax savings attributable to the NOL's of $115.4 million in 1995, $50 million in 1996, and $65 million in 1997 and come to the same net cash flow projections as the business plan.[37]

In fairness to Questrom, there is no admissible evidence as to precisely *how* the NOL's are reflected in the Morgan DCF analysis. While Federated's counsel explained at argument that they were taken into account in the deferred taxes line of the Morgan model,[38] that representation may not properly be considered here. But the critical point is that the matter of how the NOL's were reflected is not material. Even assuming that the DCF analysis were material to this motion at all, which it is not for the reasons explained above, the only important point would be that the net cash flows that Morgan used in performing it were substantially identical to those used in Federated's business plan, which Questrom concedes reflected the NOL's properly. In consequence. Questrom's contentions regarding the NOL's are unavailing.

### B. The Comparable Companies Analysis

Questrom next asserts that Morgan failed to comply with the Employment Agreement in performing its comparable companies analysis in that it (1) relied upon publicly traded stock prices of comparable companies rather than *de novo* revaluations in determining their "market value[s] ... (on a going concern basis)", (2) did not consider cash flow and capital structure, and (3) ignored sales multiples in favor of other criteria.[39] These arguments are without merit.

To begin with, the agreement required only that the valuation of Federated be "based on" the values of comparable companies. It prescribed no formula by which those values were to be determined. It did no more than refer to certain factors that the banker was to take into account. It said nothing as to what the banker was to do with them after taking them into account. Hence, all of Questrom's objections to the comparable companies analysis go to Morgan's exercise of business judgment. None rises to the level of a colorable claim of fraud, mistake or collusion, and none even arguably suggests a disregard of the Employment Agreement. Moreover, while the foregoing is entirely sufficient to compel rejection of Questrom's attack on the comparable companies analysis, each of Questrom's objections, even considered *de novo*, lacks merit.

---

**34.** *Id.* App. A, at JPM236.

**35.** Wareham Dep. at 171–74.

**36.** Harris Surreply App. B, at JPM300.

**37.** The tax saving for each year is the difference between the book tax liability and the tax payments shown for that year in the 1995–1997 business plan. *Id.* App. A, at JPM232, 236.

**38.** Tr. 52.

**39.** Pl.Mem. at 12–14.

First, the contention that Morgan should have revalued each of the comparable companies to which it looked in valuing Federated is frivolous both as a matter of law and as a matter of practical reality. As a matter of law, the Employment Agreement specifically required reference to "market" values as opposed to appraisals or other "book" valuations. To have disregarded public trading data arguably would have been inconsistent with the agreement; considering them certainly was not. And as a matter of practical reality, the parties could not have intended that the banker valuing Federated would be obliged to work up independent appraisals of the comparable companies, as there was no data from which to do so. Morgan's ability to place a value on Federated separate from the value placed upon it by the trading market arose from Morgan's possession of internal information, not available to the public, in the form of the 1995–1997 Business Plan projections. With that data, Morgan could form an opinion whether the market, acting on publicly available data only, may have under- or overvalued Federated. But Morgan lacked the same kind of information for the comparable companies. Morgan therefore could not have valued those companies correctly even if it had thought it appropriate to do so.[40]

Second, Questrom's contention that Morgan disregarded multiples of cash flow and capital structure in valuing Federated[41] is mistaken. Morgan explicitly considered capital structure in selecting the companies to which Federated was compared in performing the Base Equity Valuation,[42] several of which remained among the comparators in 1995.[43] It reviewed capital structure of the comparators again in 1995.[44] As far as cash flow is concerned, Morgan explicitly considered cash flow in its DCF analysis of Federated. The contract referred only to cash flow, not to multiples of cash flow. Morgan's work papers show that it considered EBITDA, which is related to cash flow,[45] in performing the 1995 comparable companies analysis.[46] Moreover, part of what Morgan adopted as its value range arose from a price-to-earnings analysis that was adjusted to "bring it more to a cash flow multiple." [47]

Finally, Questrom complains that Morgan employed, among other factors, a multiple of sales in valuing Federated as of 1990 but did not do so in performing the 1995 valuation. But the Employment Agreement did not even require that the same banker perform both valuations, let alone that the criteria considered be identical or consistent in all respects. Moreover, Questrom concedes that Morgan's work papers "did contain a calculation of sales multiples," [48] and the uncontroverted testimony of Morgan's team leader was that Morgan considered these data points as part of the mix in formulating its opinion.[49]

In light of the foregoing, there simply is no merit to Questrom's quarrel with the comparable companies analysis.

## III

■ In addition to challenging the manner in which Morgan made its evaluation,

---

40. Wareham Dep. at 221–22, 224–25, 244.

41. Pl.Mem. at 8.

42. Harris Aff., June 21, 1999, Ex. 2 (hereinafter "Harris Report"), Ex. A, at 3.

43. *Compare id.* Ex. B, at JPM015, *with id.* Ex. G, at JPM050.

44. Wareham Dep. 194.

45. "EBITDA" refers to earnings before interest, taxes, depreciation and amortization. *See T.R. McClure Co., Inc. Liquidating Trust v.* *TMG Acquisition Co.,* No. Civ.A. 99–537, 1999 WL 692683, *1 n. 1 (E.D.Pa. Sept.7, 1999). It is a "reasonable proxy for cash flow." Wareham Dep. at 200.

46. Harris Report, Ex. I, at JPM280.

47. Wareham Dep. at 262.

48. Pl.Mem. at 8.

49. Wareham Dep. at 198–203.

Questrom asserts that there is a triable issue of fact as to whether Morgan was biased. His principal argument is that Wareham, head of the Morgan team, was designated as a Rule 30(b)(6) witness by Morgan, that he was unable to explain certain of the judgments made by members of the team during the course of the analysis, and that "it is not unreasonable" in these circumstances to infer that Morgan sought to "drive Federated's value down." [50] He makes also the structural argument that Morgan must have been biased because it was retained and paid by Federated.[51] These assertions are purely tendentious.

Sections 7511(b)(1)(ii) and 7601 of the CPLR permit vacatur of an appraisal award such as this for partiality of a neutral appraiser.[52] An award may be upset on this ground, however, only upon a showing of actual or apparent partiality.[53] The fact that the head of the Morgan team was unable to explain in detail a number of analytical steps or assumptions made in the course of a valuation done a few years earlier does not begin to approach this standard. And Questrom's structural argument is absurd. Questrom agreed to have the valuation done by an investment banker chosen and paid by Federated, subject to a limited right on his part to object to Federated's choice. Having agreed to this method of selecting the appraiser, he will not now be heard to object to it.[54]

## IV

The complaint also seeks recovery of Questrom's attorney's fees in this action pursuant to the Employment Agreement. In the interests of concluding the case, Federated has agreed to pay Questrom's reasonable fees assuming its motion is granted.

Defendant's motion for summary judgment dismissing the complaint is granted to the extent that Questrom's claims, save that for attorney's fees, are dismissed. Questrom is entitled to judgment declaring that he shall recover his reasonable attorney's fees in prosecuting this action. In the event there is any dispute concerning the amount of those fees, the parties may apply to this Court for a determination pursuant to the Court's ancillary jurisdiction. The Clerk shall close the case.

SO ORDERED.

---

**50.** Pl.Mem. at 16.

**51.** *Id.* at 5, 17.

**52.** These provisions govern here because New York law controls the enforcement of appraisal agreements, and CPLR § 7601 in substance adopts the standards governing arbitration awards for appraisal awards. *See Questrom,* 41 F.Supp.2d at 305–07.

**53.** *See Kornit v. Plainview–Old Bethpage Cent. Sch. Dist.,* 49 N.Y.2d 842, 843, 427 N.Y.S.2d 786, 786, 404 N.E.2d 1327 (1980); *Wisner*

*Prof. Bldg., Inc. v. Zitone Constr. & Supply Co.,* 224 A.D.2d 538, 638 N.Y.S.2d 347 (2d Dept.1996).

**54.** *See, e.g., Matter of Town of Greenburgh,* 94 A.D.2d 771, 772, 462 N.Y.S.2d 718, 721 (2d Dept.), *leave to appeal denied,* 60 N.Y.2d 551, 467 N.Y.S.2d 1025, 454 N.E.2d 126 (1983) (participation in arbitration with knowledge of facts underlying claim of partiality waives objection).